[S. F. No. 16157.   In Bank.—March 21, 1941.]

BUTLER   BROTHERS   (a   Corporation),   Appellant,   v. CHARLES J. McCOLGAN, as Franchise Tax Commissioner, etc., Respondent.

Brobeck, Phleger & Harrison for Appellant.

Earl Warren, Attorney-General, H. H. Linney, James J. Arditto  and  Valentine Brookes,  Deputies Attorney-General, and Frank M. Keesling, for Respondent.

CURTIS, J.—This action was brought to recover an additional assessment made by the defendant as Franchise Tax Commissioner under authority of the Bank and Corporation Franchise Tax Act (Stats. 1929, chap. 13, as amended) for the taxable year 1936, based upon income for the year 1935, paid by plaintiff under protest. Judgment was entered in favor of defendant, and plaintiff appealed therefrom.

The cause was submitted upon an agreed statement of facts, which may be summarized as follows:

Plaintiff, Butler Brothers (herein called "the Company"), is an Illinois corporation, having its principal corporate office at Chicago. It is engaged in the wholesale dry goods and general merchandise business, purchasing from manufacturers and others and selling to retailers only. It operates seven wholesale distributing houses at Chicago, Jersey City, Baltimore, Minneapolis, St. Louis, Dallas and San Francisco. Each of these houses serves a separate trade territory. At each house stocks of goods are maintained, from which sales are made in its territory. Each house handles its own sales, and all solicitation, credit and collection arrangements in connection therewith, and keeps books of account showing the operations of the house. All sales in California were made from the San Francisco house and all receipts credited thereto.

Part of the operating expense of the houses is directly and exclusively incurred at the respective houses, including such items as labor, rentals, etc. The remainder consists of certain items of common expense such as executive salaries and corporate overhead and the expense of operating a central buying division and a central advertising division. These expenses are allocated to the respective houses on bases which, it is agreed, are in accord with recognized accounting practice, and the accuracy and propriety of such bases of apportionment are here conceded. For the year 1935 the amount of such allocated expense charged to the San Francisco house was $100,091, of which, it is agreed, approximately seventy-five per cent would have been incurred even though the San Francisco house was not operated. Except for such common expenses, each house is operated independently of each other house.

The company maintains a central buying division through which goods for resale are ordered, but such goods are shipped

by the manufacturers to the houses for which ordered, where the cost thereof and the transportation charges thereon are entered on the books of the house. No charges are made against any house for the benefit of the company, or any other house by reason of such centralized purchasing, but the actual cost of operating the central buying division is allocated to the houses, as stated in the preceding paragraph. By reason of the volume of purchases made by the company more favorable prices are obtained than would be obtainable in respect of purchases for the account of any individual house, but addition or reduction in the volume of purchases in an amount equal to the purchases made for the account of the San Francisco house would have no effect on the prices obtainable for the remaining houses.

The company computed its income from the operation of the San Francisco house by deducting from the gross receipts from sales of merchandise in California the costs of such merchandise, the direct expenses of the San Francisco house, and the apportioned share of common expenses previously described. According to this computation the San Francisco house operated at a loss of $82,851 for the year 1935. Within the time allowed by law a report showing this loss was made and the minimum tax of $25 was paid for the year 1936. In the year 1935 the operations of all houses of the company produced a profit of $1,149,677. The Franchise Tax Commissioner subsequently assessed an additional tax of $3,798.43, which, with interest amounting to $344.67, was paid under protest on September 16, 1938. The additional assessment was predicated on the allocation to California of 8.1372 per cent of the total income of the company derived from all sources, such percentage having been determined by mathematical average of the percentages which the value of the tangible property, payroll and gross sales attributable to California bore to the corresponding items of all houses of the company. If an allocation is proper, use of the particular percentage here is not questioned.

The tax in question was levied under the provisions of section 10 of the Bank and Corporation Franchise Tax Act (Deering's Gen. Laws, Act 8488, vol. 2, p. 3858; Stats. 1929, p. 19; amended by Stats. 1931, p. 2226; Stats. 1935, p. 965), which, so far as here involved, reads as follows:

"If the entire business of the bank or corporation is done within this State, the tax shall be according to or measured by its entire net income; and if the entire business of such bank or corporation is not done within this State, the tax shall be according to or measured by that portion thereof which is derived from business done within this State. The portion of net income derived from business done within this State, shall be determined by an allocation upon the basis of sales, purchases, expenses of manufacturer, pay roll, value and situs of tangible property, or by reference to these or other factors, or by such other method of allocation as is fairly calculated to assign to the State the portion of net income reasonably attributable to the business done within this State and to avoid subjecting the taxpayer to double taxation."

It is claimed by appellant that the method by which the tax was fixed and computed was unauthorized and unlawful, and that such method had the effect of taxing plaintiff on and in respect to income derived from sources beyond the jurisdiction of the state. This resulted, it is contended, in a denial of due process of law and of the equal protection of of the law, in violation of the Fourteenth Amendment of the Constitution of the United States.

On the other hand, respondent contends that the tax was levied upon income from business derived from within this state, that the operations of the company are unitary in character, and that the formula for allocation of income used by the Franchise Tax Commissioner was lawful and proper in arriving at the net income of appellant from business done in California—computed to be approximately $95,000.

The sole question to be determined on this appeal is whether it is lawful and proper for the respondent, as Franchise Tax Commissioner, to insist upon use of the formula for allocation of income in a case such as this, or whether the company is entitled to use the separate accounting of its San Francisco house to determine its net income in the State of California. The answer to this question depends entirely on the nature of the business conducted within and without the state by appellant, a foreign corporation. It is only if its business within this state is truly separate and distinct from its business without this state, so that the segregation of income may be made clearly and accurately, that the sepa-

rate accounting method may properly be used. Where, however, interstate operations are carried on and that portion of the corporation's business done within the state cannot be clearly segregated from that done outside the state, the unit rule of assessment is employed as a device for allocating to the state for taxation its fair share of the taxable values of the taxpayer (*Adams Express Co.* v. *Ohio State Auditor,* 165 U. S. 194 [17 Sup. Ct. 305, 41 L. Ed. 683], 166 U. S. 185 [17 Sup. Ct. 604, 41 L. Ed. 965]; *Pullman's Palace Car Co.* v. *Pennsylvania,* 141 U. S. 18 [11 Sup. Ct. 876, 35 L. Ed. 613]; *State Railroad Tax Cases,* 92 U. S. 575 [23 L. Ed. 663]). In the early cases in which the unit rule first made its hesitating appearance there was always a physical link, a palpable unity of substance, a binding together by a system of rails or by telegraph wires. (*State Railroad Tax Cases* (1875), *supra*; *Western Union Tel. Co.* v. *Taggart* (1896), 163 U. S. 1 [16 Sup. Ct. 1054, 41 L. Ed. 49].) Then in *Adams Express Co.* v. *Ohio State Auditor* (1897), *supra,* the standard unity of substance was openly replaced by one of unity of use and management. This decision clearly recognized that in assessing tangible property for taxation, its value producing qualities in connection with other pieces of tangible property outside the state must be considered. If there is any evidence to sustain a finding that the operations of appellant in California during the year 1935 contributed to the net income derived from its entire operations in the United States, then the entire business of appellant is so clearly unitary as to require a fair system of apportionment by the formula method in order to prevent overtaxation to the corporation or undertaxation by the state. (*Underwood Typewriter Co.* v. *Chamberlain,* 254 U. S. 113 [41 Sup. Ct. 45, 65 L. Ed. 165].) Such income would be within the purview of the statute quoted above—"The portion of the net income derived from business done within this State".

■ Preliminary to analysis and discussion of the cases cited by the parties as bearing on the issue involved in the instant case, we shall review briefly the relatively simple factual structure as it is logically reflected in the *modus operandi* of appellant's business. The company is engaged in buying merchandise from manufacturers and selling to retailers only. It maintains a central buying department outside the state. By its large scale purchasing activity, appellant concededly

is able to buy at lower prices than would otherwise be possible, thus realizing a purchasing saving. But it is able to buy in large quantities only because it is able to sell in large quantities, so that it is apparent that the purchasing saving is made possible only because of the sales. Furthermore, it is pertinent to observe that the saving is not turned into profit until the sales are made. Thus, the purchasing activities and the sales activities are interdependent and supplement one another to form one single, unitary business. Appellant here calls attention to the fact that the parties stipulated that if an amount of sales equal to those of the San Francisco store were eliminated, the volume would not be reduced enough to affect the price at which appellant bought. On this ground appellant urges that the San Francisco store is the one which does not affect purchase price differentials. But, as respondent urges, it also should be noted that it was stipulated that appellant bought at lower prices because of the great volume it obtained through having several stores. The weakness of appellant's argument is readily apparent when pursued to its logical conclusion. If the omission of the California sales would have no effect on the purchasing power, the omission of sales in an equal amount wherever made would likewise have no effect on the company's ability to purchase at a saving. Thus, by proceeding in turn from state to state, it could be shown that none of the sales in any of the states should be credited with the income resulting from the purchasing of goods in large quantities. It is our opinion that the sales made in each of the seven states in which appellant does business must be proportionately credited with the profits resulting from the purchasing power which such sales in the aggregate produce. Other salient factors indicating the unitary character of appellant's business are the central advertising division and the central accounting and management division. The former enables appellant to spread its advertising cost over more stores and units and to secure its advertising at a lower cost per unit, thereby making possible advertising opportunities unavailable to a single store; as to the latter (central accounting and management department), the volume of business resulting from operation of the company's several stores permits better as well as more costly services of accounting and management to be available to each store, whereas if each

were separately operated, services of such quality in all probability would be too expensive to be practicable.

The Supreme Court of the United States has repeatedly held that companies whose income has resulted from a series of transactions beginning with manufacture in one state and sales in another were unitary businesses. (*Underwood Typewriter Co.* v. *Chamberlain* (1920), 254 U. S. 113 [41 Sup. Ct. 45, 65 L. Ed. 165] ; *Bass, Ratcliff & Gretton, Ltd.,* v. *State Tax Com.* (1924), 266 U. S. 271 [45 Sup. Ct. 82, 69 L. Ed. 282].) While it is not clear from the record whether appellant manufactured any of its goods in the State of Illinois or elsewhere, it is conceded that appellant purchased most of its goods through the Illinois central purchasing arrangement. This central purchasing factor is completely analogous and comparable to the manufacturing activities in the Underwood Typewriter and Bass Ale cases, *supra,* wherein we find recognition of the principle that income from sales is attributable to the series of transactions from which the income is derived. Since these two leading cases involve the validity of allocation by applying a percentage formula to the entire income in order to determine the income taxable in a state where the business is only partly carried on, we shall consider them in some detail.

In *Underwood Typewriter Co.* v. *Chamberlain, supra,* the company manufactured its typewriters in Connecticut and sold them generally throughout the country. Using a statutory method of allocation (by assigning to the state that portion of the total income which the value of real and tangible personal property within the state bore to the total value of such property within and without the state), Connecticut determined that 47 per cent of the company's net income was derived from property and transactions within the state. The company objected to the method of apportionment on the ground that only a little over 3 per cent of its net receipts was collected in Connecticut. The court upheld the Connecticut allocation for the reasons expressed in the following excerpt from the opinion at pages 120, 121:

" . . . The profits of the corporation were largely earned by a series of transactions beginning with manufacture in Connecticut and ending with sale in other States. In this it was typical of a large part of the manufacturing business conducted in the State. The legislature in attempting to put

upon this business its fair share of the burden of taxation was faced with the impossibility of allocating specifically the profits earned by the processes conducted within its borders. It, therefore, adopted a method of apportionment which, for all that appears in this record, reached, and was meant to reach, only the profits earned within the State. 'The plaintiff's argument on this branch of the case,' as stated by the Supreme Court of Errors, 'carries the burden of showing that 47 per cent. of its net income is not reasonably attributable, for purposes of taxation, to the manufacture of products from the sale of which 80 per cent. of its gross earnings was derived after paying manufacturing costs.' The corporation has not even attempted to show this; and for aught that appears the percentage of net profit earned in Connecticut may have been much larger than 47 per cent. There is, consequently, nothing in this record to show that the method of apportionment adopted by the State was inherently arbitrary, or that its application to this corporation produced an unreasonable result.''

Here we have clear and concise expression of the only limitation on the use of a formula in the allocation or apportionment of income of a unitary business, to wit, the formula must not be intrinsically arbitrary, and it must not produce an unreasonable result.

*Bass, Ratcliff & Gretton, Ltd.,* v. *State Tax Com., supra,* involved a British corporation engaged in brewing and selling Bass' ale. Its brewing was done and a large part of its sales were made in England, but it had imported a portion of its product into the United States, which it sold in branch offices maintained in New York and Chicago. During the income year in question, the entire business was operated at a substantial profit, but the company, for federal income tax purposes, reported no income for that year from its business within the United States. Presumably this result was reached by computing its income under the separate accounting method. The Tax Commission of the State of New York assigned to New York that portion of the total net income which the value of certain specified classes of assets within New York bore to the total value of such assets within and without the state. The company resisted the tax on the ground that it derived no income from New York and that the action of the commission was an attempt to assign to

New York a portion of the company's income derived from business carried on outside the United States. The court, however, upheld the action of the commission and at page 282 of its opinion expressed its views regarding the allocation of income of unitary businesses as follows:

"So in the present case we are of the opinion that, as the Company carried on the unitary business of manufacturing and selling ale, in which its profits were earned by a series of transactions beginning with the manufacture in England and ending in sales in New York and other places—the process of manufacturing resulting in no profits until it ends in sales—the State was justified in attributing to New York a just proportion of the profits earned by the Company from such unitary business. In *Wallace* v. *Hines,* 253 U. S. 66, 69 [40 Sup. Ct. 435, 64 L. Ed. 782], it was recognized that a State, in imposing an excise tax upon foreign corporations in respect to doing business within the State, may look to the property of such corporations beyond its borders to 'get the true value of the things within it, when they are part of an organic system of wide extent,' giving the local property a value above that which it would otherwise possess, and may therefore take into account property situated elsewhere when it 'can be seen in some plain and fairly intelligible way that it adds to the value of the (property) and the rights exercised in the State.' This is directly applicable to the carrying on of a unitary business of manufacture and sale partly within and partly without the State."

Thus, it is apparent from the language of this case that with respect to a unitary business, income from the taxing state as determined by an allocation formula was controlling, where the statutory method of apportionment was not shown to be arbitrary or unreasonable.

In support of its argument that respondent's application of the formula would tax income from transactions taking place beyond the jurisdiction of California, appellant relies heavily upon *Hans Rees' Sons* v. *State of North Carolina* (1931), 283 U. S. 123 [51 Sup. Ct. 385, 75 L. Ed. 879]. But an examination of the facts and legal principles involved therein reveals that there is nothing in that decision to support appellant's argument. The corporation was engaged in the business of tanning, manufacturing and selling leather products, and its principal manufacturing and supply house was

located in North Carolina. Extensive sales and purchasing activities were carried on outside the state. The corporation offered proof which tended to show that for the years in question the average income having its source within the state was but 17 per cent of the total and actually showing that the percentage of its income attributable to North Carolina did not in any event exceed 21.7 per cent of the total, whereas the statutory formula, restricted to tangible property, had allocated to North Carolina approximately 89 per cent of the income. The opinion clearly recognized the necessity of using a method of apportioning to a state that portion of entire income which is "reasonably attributable to the processes conducted within the borders of that State," but because the particular statutory formula employed, consisting simply of the property factor, attributed to North Carolina a percentage of income "out of all appropriate proportion to the business transacted by the appellant in that State," the court refused to approve the result reached by the formula. Careful analysis of the underlying legal principles considered in the Hans Rees' case compels us to conclude that it, like the Underwood Typewriter and Bass Ale cases, *supra,* recognized that where a business is unitary in character, so that its separate parts cannot be fairly considered by themselves and the whole business in the several states derives a value from the unity of use, allocation of income upon a reasonable formula is properly sustained.

The latest expression of the Supreme Court of the United States on this subject brought to our attention is *North American Cement Corp.* v. *Graves* (1936), 269 N. Y. 507 [199 N. E. 510]; 243 App. Div. 834 [278 N. Y. Supp. 920]; 299 U. S. 517 [57 Sup. Ct. 311, 81 L. Ed. 381], wherein it is significant to note that *Bass, Ratcliff & Gretton, Ltd.,* v. *State Tax Com., supra,* was cited in support of its holding that income from the taxing state as determined by an allocation formula was controlling, although the taxpayer showed that by separate accounting much less income would be allocated to the taxing state. The United States Supreme Court and the New York courts from which the taxpayer appealed all decided the case with memorandum opinions, so the facts must be obtained from the record in the case (vol. 2253, United States Supreme Court Records). The taxpayer, a foreign corporation, owned

and operated three cement plants and one lime plant and sold the products thereof. Two of the cement plants were in New York, one was in Maryland and the lime plant was in West Virginia. The corporation operated its four plants separately and sold their products in separate districts, kept separate accounts for them, and sold very little of the output of the West Virginia and Maryland plants in New York. The Tax Commission allocated the net income of the corporation by a one factor formula (property factor) for the income years 1925, 1926, 1927 and 1929. By this means large incomes were allocated to New York for each of those years. The corporation, by an elaborate separate accounting system, showed that for 1925 the New York income was much less than that allocated to that state by the formula, and that for 1926, 1927 and 1929 the corporation sustained large losses from its New York business instead of deriving from New York the income allocated to it by the formula. In the face of this evidence the Supreme Court of the United States, affirming the New York Court of Appeals and Appellate Division, Supreme Court, held that the results of the formula were controlling and upheld the assessment thereon.

The significance of this decision on two points involved in the instant case is readily apparent: (1) It holds that the operations of four separate manufacturing plants, one of them making a different product from different materials than the others, are so interrelated as properly to be treated as *unitary*; (2) it holds that separate accounting in accordance with recognized accounting practice is insufficient evidence to disprove the propriety and presumption of fairness of formula allocation. On both points this decision is contrary to *Standard Oil Co.* v. *Wisconsin Tax Com.* (1929), 197 Wis. 630 [223 N. W. 85], on which appellant strongly relies in asserting that the results of its separate accounting must be accepted by respondent as tax administrator. However, careful examination of the factual situation in this Wisconsin case reveals a peculiar distinguishing allocation factor which undoubtedly exerted a strong influence on the result reached by the court there.

In *Standard Oil Co.* v. *Wisconsin Tax Com., supra,* the plaintiff company produced, refined, transported and marketed petroleum products in eleven mid-western states, and its property within Wisconsin consisted principally of tanks

and filling stations required to supply the Wisconsin demand. Fifty-four per cent of the oil stored in these tank farms was sold to Wisconsin and 46 per cent without the state. Plaintiff company did practically no manufacturing in Wisconsin. The controversy arose as to the manner in which that part of its income properly taxable in the state of Wisconsin should be ascertained. The Tax Commission used a ratio method provided in the statute for unitary business transactions conducted within and without the state. The company contended that its income should be ascertained by the allocation and separate accounting method by which the Wisconsin business was charged *at the market price* with all products received by it, with the expense of transacting the business, including a proper allocation of general or overhead expenses and office accounting, that there should be credited to Wisconsin the gross amount received from sales of goods within the state, and that the difference constituted the taxable income of plaintiff company. The court upheld the plaintiff company's contentions. The distinction to be noted here differentiating this Wisconsin situation from the instant case is the fact that the products furnished to the Wisconsin business were charged at *"market value"* rather than at cost. *Market value* (at wholesale) included reasonable *profit,* and such profit became income to the company in the outside states. This amounted in effect to allocation of income as between Wisconsin and the other states. That the plaintiff company's arbitrary method of assigning a fictitious market value at which the selling division was deemed to have "bought" the oil from the refining division greatly impressed the Wisconsin court and furnished reason for its distinction of the Underwood Typewriter case, *supra,* appears from the following language at page 639 of the opinion: "Nor do we find anything in *Underwood Typewriter Company* v. *Chamberlain,* 254 U. S. 113 [41 Sup. Ct. 45, 65 L. Ed. 165], inconsistent with our conclusion in this case. There, there was no separation on the basis of market value between the operation of the manufacturing department and the sales department as there is in this case. We perceive no reason why, under the facts in this case, the profits derived from the sales operations should not be ascertained, so far as plaintiff is concerned, as they would be if the sales operations were conducted by a separate corporate entity." Whether the Wis-

consin court by its decision placed too much emphasis on the value of fictions is not our concern here; suffice it to say that the Wisconsin court manifestly sanctioned the practice of charging the products to the Wisconsin end of the business at *wholesale market prices* in determining income derived in Wisconsin. The distinction between *market price* and *cost* cannot be ignored; the former includes profits and the latter does not; and it is this differentiation which decidedly limits the applicability of the Wisconsin case to the instant factual situation.

The unitary character of the buying and selling business has been recognized in *International Elevator Co.* v. *Thoresen* (1929), 58 N. D. 776 [228 N. W. 192], and *Great Atlantic & Pacific Tea Co.* v. *Grosjean* (1937), 301 U. S. 412 [57 Sup. Ct. 727, 81 L. Ed. 1193, 112 A. L. R. 293]. In the Thoresen case, *supra,* plaintiff company operated a line of grain elevators, about half of which were in Montana and the other half in North Dakota. The company's income was derived chiefly from the sale, outside the state, of grain bought within North Dakota, and the question was whether North Dakota could assess a tax upon any part of the income from the sales outside the state. Like appellant here, the plaintiff company there tried to apportion its income by separate accounting. That procedure was held improper and allocation of income was sanctioned to North Dakota wholly out of proportion to the receipts within North Dakota. On the mere basis of accounting figures the instant case is less extreme than the North Dakota case, where the net income allocated to the taxing state by the formula exceeded the gross income allocated to the state by separate accounting; yet, in such situation because of the unitary nature of the business, the Supreme Court of North Dakota held that the transactions of buying constituted an essential part of the transactions from which the income collected outside the state was derived.

The Great Atlantic & Pacific Tea Co. case, *supra,* dealing with a state chain store tax act, bears on the instant issue in that it was there held that the out-of-state stores and central buying and advertising of the buying and selling corporation gave the within-the-state stores advantages which they otherwise would not have had and justified a chain store tax on the within-the-state stores which would otherwise have been, from the constitutional viewpoint, discriminatory. The

manifest parallelism between that case and the instant one needs no other comment than the observation that the decision of validity in that case is based on the same reason as that for treating business as unitary in allocating income.

The formula method of allocating or apportioning income in the case of a unitary business was approved by this court in *Matson Nav. Co.* v. *State Board of Equalization*, 3 Cal. (2d) 1 [43 Pac. (2d) 805]; affirmed 297 U. S. 441 [56 Sup. Ct. 553, 80 L. Ed. 791]. In that case it was established that the power of California to tax foreign corporations measured by their net income and the provisions of section 10 of the Bank and Corporation Franchise Tax Act are co-extensive in scope, and in this connection this court there held that section 10 measures the tax by income from California and excludes from the measure "income from business done entirely outside the State . . . ". (3 Cal. (2d) 1, 8.) In such case as the instant one, allocation of income to the various states in which the business is done by means of a formula that gives weight to the various factors such as property, services of employees and sales, which are responsible for the earning of income, appears entirely reasonable. To rebut the presumption that the formula produced a fair result, "the burden is on the taxpayer to make oppression manifest by clear, cogent evidence". (*Norfolk & Western Ry. Co.* v. *North Carolina* (1936), 297 U. S. 682, 688 [56 Sup. Ct. 625, 80 L. Ed. 977].) In considering the implications of the formula in the last-mentioned case, the Supreme Court of the United States, speaking through Mr. Justice Cardozo, also said at page 688: " . . . a taxpayer does not escape the application of the statute by evidence directed to only one of the related terms. The evidence to be effective must be directed to each of them alike, for only thus can the assumed relation between them be proved to be unreal. . . . " In the case at bar appellant has not furnished any explanation of why its California business differs so from the average that the formula produced an erroneous result. Here there has been only an assertion that a loss was incurred in this state. As appellant has failed to show a variance from normal in either the California sales, property or payroll, or in either expenses or revenues, it is our conclusion that appellant has not upheld its burden of proof, for in order to overthrow a formula the taxpayer must introduce such evidence and the evidence must go to

each element of the formula equation. (*Norfolk & Western Ry. Co.* v. *North Carolina, supra.*)

In accordance with the foregoing analysis it is our opinion that the unitary nature of appellant's business is definitely established by the presence of the following circumstances: (1) Unity of ownership; (2) Unity of operation as evidenced by central purchasing, advertising, accounting and management divisions; and (3) unity of use in its centralized executive force and general system of operation. The reasonable and equitable character of this state's formula, based on factors properly reflecting the relative contribution of the activities in the various states to the production of the total unitary income so as not to contravene the restrictions implicit in the Fourteenth Amendment against taxing property outside the state, was recognized in *Matson Nav. Co.* v. *State Board of Equalization, supra.* Accordingly, respondent correctly applied the formula method of apportionment to determine California's portion of appellant's income from the business carried on within and without the state.

Judgment affirmed.

Gibson, C. J., Shenk, J., and Carter, J., concurred.

Traynor, J., took no part in the consideration or decision of this case.

Appellant's petition for a rehearing was denied April 17, 1941. Traynor, J., took no part in the consideration or decision of this matter.