683 P.2d 846

**ALBERTSON'S, INC., a Delaware Corporation, Plaintiff-Respondent,**

v.

**STATE of Idaho, DEPARTMENT OF REVENUE, STATE TAX COMMISSION, Defendant-Appellant.**

**No. 14808.**

Supreme Court of Idaho.

May 23, 1984.

---

Jim Jones, Atty. Gen., Lynn E. Thomas, Sol. Gen., and William B. Dillon, III, Deputy Atty. Gen., Boise, for defendant/appellant.

Robert L. Miller, Boise, for plaintiff/respondent.

HUNTLEY, Justice.

The principal issue on appeal is whether it is appropriate to treat the income of a Texas corporation which is a wholly-owned subsidiary of Albertson's, Inc. as income of the parent corporation, subject to apportionment under the Idaho version of the Uniform Division of Income for Tax Purposes Act (UDITPA). Fundamental to the determination of that issue is whether the two corporations constitute a "unitary business" for tax purposes.

## I

### THE FACTUAL BACKGROUND

In 1965 Idaho adopted with slight modification the Uniform Division of Income for Tax Purposes Act (UDITPA). I.C. § 63–3027. The Act contains rules for determining the portion of a corporation's total income from a multistate business which is attributable to this state and therefore subject to Idaho's income tax. In general, UDITPA divides a multistate corporation's income into two groups: business income and non-business income. Business income is apportioned according to a three factor formula, I.C. § 63–3027(i), while non-business income is allocated to a specific jurisdiction, I.C. § 63–3027(d)–(h). Idaho modified UDITPA to provide that "a parent and subsidiary corporation may, when necessary to accurately reflect income, be considered a single corporation." I.C. § 63–3027(s) (1975 version).

Albertson's, Inc. (Albertson's) is a Delaware corporation based in Idaho which owns and operates a chain of retail grocery supermarkets. This case involves a deficiency assessment of $42,839, plus interest for fiscal years ending February 1st, 1975, January 31st, 1976, and January 29th, 1977, respectively.

As of January 31st, 1976, Albertson's operated 313 stores in the western United States under 9 divisions as follows:

| | |
|---|---|
| Idaho (including Eastern Oregon and Elko, Nevada) | 20 |
| Inland Empire (Eastern Washington, Northern Idaho and Montana) | 24 |
| Utah | 28 |
| Western Washington | 32 |
| Oregon (Western Oregon) | 31 |
| Southern California (including Southern Nevada and Yuma, Arizona) | 43 |
| Northern California (including Northern Nevada) | 45 |
| Rocky Mountain (Colorado, Wyoming, and New Mexico) | 29 |
| Skaggs-Albertson's | 61 |
| | 313 |

The resolution of this appeal requires detailed consideration of the organization, operations and relationships between Albertson's and its subsidiary Texas-Albertson's. It is helpful also to understand the relationship between those two corporations and the Skaggs-Albertson's partnership.

Skaggs-Albertson's was formed in 1968, Skaggs having been primarily an operator of "super drug stores" and Albertson's having been an operator of grocery stores. The management of Skaggs and Albertson's determined that it would be in their mutual interest to house the two types of stores under one roof, and in 1968 formed a partnership denominated Skaggs-Albertson's. Each parent corporation was to own 50% of the partnership and its initial operation commenced with the contribution by Skaggs of 11 stores it had in Texas, with Albertson's contributing cash equal in value to the 11 stores. By the time the partnership was dissolved in 1977, Skaggs-Albertson's had expanded from the original 11 stores to an operation of approximately 70 stores.

A few months after the Skaggs-Albertson's partnership was formed, because of certain benefits under Texas tax laws and for limitation of liability and other reasons, the parties determined that it would be desirable to establish separate corporations which would be holding companies for their respective 50% interests in the Skaggs-Albertson's operation. Accordingly, Albertson's formed a wholly-owned subsidiary corporation called Texas-Albertson's, Inc. (Texas-Albertson's). Skaggs formed a similar holding corporation, Texas-Skaggs, Inc. (Texas-Skaggs).

The expansion and development of new stores by Skaggs-Albertson's was accomplished generally through the following described device. An additional corporation was formed, Skaggs-Albertson's Properties, Inc., which would procure the financing for the construction of new buildings on the credit of Skaggs for 50% of the buildings and on the credit of Albertson's for the other 50% of the buildings. Skaggs-Albertson's Properties, Inc. held

the buildings during construction, and then sold them to an investor, who then leased the stores to either Skaggs or Albertson's, each being the separate lessees of an equal number of the stores. Then the lessee, Skaggs or Albertson's as the case might be, would sublease the store to the Skaggs-Albertson's partnership.

All directors and officers of Texas-Albertson's, Inc. were directors, officers or employees of Albertson's. Texas-Albertson's held only one formal board meeting, that being the initial board meeting when it was first formed. Albertson's then vice-chairman and chief financial administrative officer who at various times was executive vice-president of administration and finance, and president and chief financial administrative officer of Albertson's, served as a member of the Texas-Albertson's board and as an officer of Texas-Albertson's. He negotiated financing for all of the Albertson's divisions including the stores being added to Skaggs-Albertson's. He testified:

> Ultimately, the two corporations, Texas-Albertson's and Texas-Skaggs, were really shell corporations. We didn't use them for any other purpose than just mechanics.

Between 1968 and 1977, Albertson's had advanced monies to Skaggs-Albertson's by way of direct cash contributions, or procurement of loans. Those advances plus the retention by Skaggs-Albertson's of internally generated funds totaled $20,058,606. There was no formal arrangement for specific interest payments on those advances, nor was there an agreement for the return of that capital.

The record established the following transactions as representative of the type of financial involvement and assistance Albertson's, Inc. engaged in with respect to the stores in the Skaggs-Albertson's division: (a) cash advance on October 15, 1969 of $1,125,000 to Skaggs-Albertson's Properties, Inc. for the purpose of providing Albertson's share of the funds to hold title to seven parcels of real estate in Texas; (b) on the next day, the seven properties were

transferred from Albertson's, Inc. to Skaggs-Albertson's Properties, Inc.; (c) in October 1969, Albertson's, Inc. procured a $3,000,000.00 loan commitment from the United States Steel and Carnegie Pension Fund, Inc., transferred seven of the corporation's stores to the pension fund under a sale-leaseback arrangement, and then provided that the unused portion of the $3,000,000 loan commitment would be made available to Skaggs-Albertson's for use in the sale and leaseback of new store properties; (d) in February 1972, Albertson's transferred $2,507,577.20 to the Skaggs-Albertson's partnership for the purpose of purchasing seven Katz stores owned by Skaggs in Oklahoma and Arkansas; and (e) in May 1972, Albertson's then executive vice-president for administration and finance reported having negotiated a $7,500,-000 commitment with Southwestern Bell Telephone Pension Fund to cover sale-leaseback commitments of the Skaggs-Albertson's operation at $7\frac{1}{8}\%$ to $7\frac{1}{4}\%$ effective interest rate.[1]

Because of anticipated anti-trust problems[2] and differing philosophies of growth, the parties agreed to terminate and dissolve the Skaggs-Albertson's partnership effective March 31, 1977, and distribute the assets between the two parent companies. When the dissolution of Skaggs-Albertson's occurred, the stores and accumulated profits were evenly divided (50% each) and transferred to Skaggs, Inc. and Albertson's

Inc. respectively. Those facilities received by Albertson's were then placed in its Southco Division.

Albertson's annual reports for fiscal years ending February 1st, 1975 and January 31st, 1976 make no mention of the Texas-Albertson's subsidiary corporation but rather describe the relationship as being directly between Albertson's and Skaggs-Albertson's.[3]

No separate financial reports were ever made from Texas-Albertson's to Albertson's.

During the three years in question, the following income payments were made by Skaggs-Albertson's to Texas-Albertson's:

| 1975 | $3,370,354 |
| 1976 | $5,897,626 |
| 1977 | $10,989,862 |
| | $20,257,842 |

It is that $20,257,842 of income to Texas-Albertson's which is the basis of the $50,-615 ($42,839 plus interest) deficiency determination made by the Tax Commission after applying the three factor formula of UDIPTA.

In 1977 the partnership paid Albertson's $746,890 on the advances, which equates to an annual return of 3.7% on $20,058,606, the $746,890 having been reported to Idaho as business income. No such interest or Idaho business income was reported for either 1975 or 1976.

---

1. As an Albertson's official serving as Chief Financial Officer he testified:

   Well, we're, in effect, dealing with a financial market that's concerned about credit and familiarity with companies and most of our discussions centered around the ease of putting these transactions together. And so, it was just a lot easier, as a result, to use either the Skaggs credit or the Albertson's credit to finance these stores.

2. The notice of the special meeting of the board of Albertson's, Inc. contained the following statement:

   As we mentioned at the last board meeting, both Skaggs and ourselves have been studying the partnership and attempting to determine what the long range plans for this partnership must be. Outside legal counsel has told both of us recently that governmental investigation and interference is only a matter of time.

3. The Albertson's, Inc. form 10-K, the annual report to the Securities and Exchange Commission for the fiscal year ending January 29, 1977, contains the following statement:

   During 1976 as a 50% partner with Skaggs Companies, Inc., of Salt Lake City, the Company participated in the ownership of 59 super drug-grocery combination stores under the "Skaggs-Albertson's" name and 13 drug stores under the "Skaggs" name in five Southwestern and Southern states.

   On January 31, 1977, the Company agreed to end its partnership with Skaggs. Albertson's will, in the future, independently operate 30 combination units and one drug store. Current sales and earnings from the stores retained are estimated to be approximately 50% of the sales and earnings of the partnership before dissolution.

## II.

### THE ACCOUNTING TREATMENT FOR TAX PURPOSES

The audit staff of the Tax Commission determined that Texas-Albertson's was engaged in a unitary business with the parent corporation, Albertson's, and therefore income of the subsidiary should be combined with that of the parent corporation in reporting income pursuant to the version of I.C. § 63–3027(s) then effective, which provided:

> For purposes of this section, a parent and subsidiary corporation may, when necessary to accurately reflect income, be considered a single corporation.

That determination of the audit staff was affirmed and adopted by the Tax Commission in its decision; however, the trial court overruled the Commission, concluding that Texas-Albertson's was not a part of Albertson's unitary business. This appeal followed.

### Standard of Review and Burden of Proof

█ The factual foundation of this case is comprised of a stipulation of the parties as to certain facts, documents which were stipulated into evidence, and a small amount of testimony which is, in all material respects, undisputed. The standard of review therefore, is that set forth in *American Smelting and Refining Company v. Idaho State Tax Commission*, 99 Idaho 924, 592 P.2d 39 (1979), *rev'd on other grounds*, 458 U.S. 307, 102 S.Ct. 3103, 73 L.Ed.2d 787 (1982):

> Finally, the facts in this case are based substantially on a lengthy stipulation between the parties, and for the most part they are not disputed. The decisive issues concern the proper application of the Idaho version of UDITPA to these facts. Accordingly, the scope of our review, which is a review of questions of law, is substantially broader than in cases where we are reviewing issues which turn on the resolution of disputed facts. *Id.* at 933, 592 P.2d at 48.

The trial court's memorandum opinion shows that it believed the burden of proof was on the Tax Commission. The court stated:

> In line with the *ASARCO* decision, the court must determine if the evidence shows sufficient control exercised by Albertson's, Inc., over the management and operations of Texas-Albertson's to fall within the narrower definition of the unitary business adopted by the U.S. Supreme Court. *It appears that the state fails in this respect.* R. p. 54, L. 1–6 (emphasis added).

The burden of proof was actually upon Albertson's to prove the decision of the Tax Commission was incorrect:

> [W]hat appellant must show, in order to establish that its dividend income is not subject to an apportioned tax in Vermont, is that the income was earned in the course of activities unrelated to the sale of petroleum products in that state. . . . In the absence of any proof of discrete business enterprise, Vermont was entitled to conclude that the dividend income's foreign source did not destroy the requisite nexus with in-state activities. *Mobil Oil Corporation v. Commissioners of Taxes of Vermont*, 445 U.S. 425, 439, 100 S.Ct. 1223, 1232–1233 [63 L.Ed.2d 510]. *See, ASARCO, Inc. v. Idaho State Tax Commission*, [458 U.S. 307], 102 S.Ct. 3103, 3115, n. 22 [73 L.Ed.2d 787] (1982).

### Combined Reporting and the Concept of "Unitary Business"

Idaho Code § 63–3027 is the Idaho version of the Uniform Division of Income for Tax Purposes Act (UDITPA). Section 63–3027(s) is an addition to the act, clarifying the application of UDITPA to unitary businesses conducted through a multicorporate structure. Combined reporting is a refinement of the apportionment principle:

> The combined reporting provision of subsection (s) is a further refinement of the basic apportionment principle. Its purpose is to permit application of the UDITPA formula to a single business enter-

prise which is conducted by means of separately incorporated entities. *See United States Steel Corp. v. Multistate Tax Commission*, 434 U.S. 452, 473, n. 25, 98 S.Ct. 799, 813, n. 25, 54 L.Ed.2d 682 (1978). In an economic sense such a business is no different than a similar business composed of a single corporation with several separate divisions. *Compare Butler Bros. v. McColgan, supra* [17 Cal.2d 664, 111 P.2d 334], *with Edison California Stores, Inc. v. McColgan*, 30 Cal.2d 472, 183 P.2d 16 (1947). For tax reporting purposes such businesses should be treated the same. *Coca Cola Co. v. Department of Revenue*, 271 Or. 517, 533 P.2d 788 (1975); Keesling, A Current Look at the Combined Report and Uniform Allocation Practices, 42 J.Tax. 106 (1975). *ASARCO, supra*, 99 Idaho at 934–35, 592 P.2d at 49–50 (1979).

■ Combined reporting can be required only in the case of a unitary business. The first commonly used definition or test for a unitary business was set forth in *Butler Bros. v. McColgan*, 17 Cal.2d 664, 111 P.2d 334 (1941), *affd.*, 315 U.S. 501, 62 S.Ct. 701, 86 L.Ed. 991 (1942), and required unity of ownership, unity of operation, and unity of use. *Edison California Stores v. McColgan*, 30 Cal.2d 472, 183 P.2d 16 (1947) reaffirmed the three unities test and offered a further guideline:

> If the operation of the portion of the business done within the state is dependent upon or contributes to the operation of the business without the state, the operations are unitary .... 30 Cal.2d at 481, 183 P.2d at 21.

This Court adopted those same principles for defining a unitary business in *ASARCO, supra*.[4]

---

**4.** Business income is defined as: "63–3027. COMPUTING TAXABLE INCOME OF NON-RESIDENT PERSONS AND ANY CORPORATIONS.—... (a) As used in this section, unless the context otherwise requires: (1) 'Business income' means income arising from transactions and activity in the regular course of the taxpayers' trade or business and includes income from the acquisition, management, or disposition of tangible and intangible property when such acquisition, management, or disposition constitute integral or necessary parts of the taxpayers' trade or business operations. Gains or losses and dividend and interest income from stock and securities of any foreign or domestic corporation shall be presumed to be income from intangible property, the acquisition, management, or disposition of which constitute an integral part of the taxpayers' trade or business; such presumption may only be overcome by clear and convincing evidence to the contrary...." A few general comments concerning this definition of business income are necessary in order to put the issues raised in this appeal in the proper perspective. First, the income referred to in subsection (a)(1) is income arising from the taxpayer's trade or business which is conducted, in part at least, in this state. Some corporations, particularly large conglomerates, may be engaged in several separate and distinct trades or businesses. The state may include as business income only the taxpayer's income arising from a trade or business conducted in this state and is not entitled to apportion income arising from a trade or business having no connection with this state. However, "whether a number of business operations having common ownership constitute a single or unitary business or several separate businesses for tax purposes depends upon whether they are of mutual benefit to one another and on whether each operation is dependent on or contributory to others." *Great Lakes Pipe Line Co. v. Commissioner of Taxation*, 272 Minn. 403, 408, 138 N.W.2d 612, 616 (1965), *appeal dismissed* 384 U.S. 718, 86 S.Ct. 1886, 16 L.Ed.2d 881 (1966). *See Sperry & Hutchinson Co. v. Department of Revenue*, 270 Or. 329, 527 P.2d 729 (1974); Idaho State Tax Comm.Reg. 27.-IV.1.(b). This qualification, though not directly stated by the statute's literal language, is required by the theory underlying apportionment statutes, i.e., that the business income of a unitary business operating in several states cannot be precisely identified with particular states, *see generally, Butler Bros. v. McColgan*, 315 U.S. 501, 62 S.Ct. 701, 86 L.Ed. 991 (1942); Keesling & Warren, The Unitary Concept in the Allocation of Income, 12 Hastings L.J. 42 (1960), and by the constitutional requirement that there must be some minimal connection between the interstate business activities generating the income and the state seeking to tax that income. *See Moorman Mfg. Co. v. Bair*, 437 U.S. 267, 98 S.Ct. 2340, 57 L.Ed.2d 197 (1978); *Champion International Corp. v. Bureau of Revenue*, 88 N.M. 411, 540 P.2d 1300, 1307–08 (Ct.App.1975) (Lopez, J., specially concurring). 99 Idaho at pages 930–931, 592 P.2d 39 (emphasis and footnotes omitted).

It is clear that the three unities as between Albertson's, Inc. and Texas-Albertson's, Inc. are present in this case and it is also clear that the business done within Idaho contributes to the operation of the business without the state. Albertson's, Inc. provided Texas-Albertson's directors and principal officers from the ranks of Albertson's personnel at no expense to Texas-Albertson's, Inc. These factors fall within the principles enunciated in *F.W. Woolworth Co. v. Taxation and Revenue Dept.*, 458 U.S. 354, 102 S.Ct. 3128, 73 L.Ed.2d 819 (1982), where the court stated the test to determine whether a unitary relationship exists between a parent and its subsidiary is:

> [W]hether "contributions to income [of the subsidiaries] result[ed] from functional integration, centralization of management, and economies of scale." If such "factors of profitability" arising "from the operation of the business as a whole" exist and evidence the operation of a unitary business, a State can gain a justification for its tax consideration of value that has no other connection with that state. *Id.* at 364, 102 S.Ct. at 3135 (citations omitted).

*Container Corp. of America v. Franchise Tax Board*, 463 U.S. 159, 103 S.Ct. 2933 (1983), was handed down after the trial judge's ruling but prior to oral arguments in this case. The decision reiterates and clarifies the traditional standards set forth above.

In *Container* the Court lists five criteria that must be met to establish a unitary business for tax purposes; (1) a minimal connection or nexus between the interstate activities and the taxing state; (2) a rational relationship existing between the income attributed to the state and the intrastate values of the enterprise; (3) at least some part of the purported unitary business be conducted in the taxing state; (4) some bond of ownership or control which unites the purported unitary business; and (5) the out-of-state activities of the purported unitary business relate in some concrete way to the in-state activities.[5]

It should be noted parenthetically that the *ASARCO* and *Woolworth* decisions were issued by the Supreme Court shortly before the trial judge's ruling. This undoubtedly influenced that decision but the *Container* decision acts to modify whatever encouragement corporations may have taken from *ASARCO/Woolworth* in their efforts to avoid unitary classification. The United States Supreme Court itself suggested in those two cases which overturned unitary determinations by state tax commissions, that with a better establishment of the facts at the trial level a unitary determination could well have been sustained.

This is not to say that Idaho corporations cannot make non-unitary passive investments in genuinely separate and distinct corporations, but a company cannot structure a close operational and unitary relationship with a subsidiary and then prevail in an attempt to characterize it as a "passive investment."

The close relationship that existed between Container Corp. and its subsidiaries led the United States Supreme Court to find that the lower courts were justified in finding a unitary business.

The parallel between the facts in *Container* and those in this case is striking. In almost every respect Albertson's operational relationship with Texas-Albertson's was as close as or greatly exceeded that which existed between Container Corp. and its subsidiaries. Like Texas-Albertson's,

---

**5.** The Court explains this last test by stating: [T]he functional meaning of this requirement is that there be some sharing or exchange of value not capable of precise identification or measurement—beyond the mere flow of funds arising out of a passive investment or a distinct business operation—which renders formula apportionment a reasonable method of taxation.

The close management expertise, direction and supervision, and the financial investment of Albertson's outlined below resulted in just this kind of flow of value to Texas-Albertson's.

one of Container Corp.'s subsidiaries was a holding company with no payroll, sales or property of its own. The Container Corp. subsidiaries were relatively autonomous in matters of personnel and day-to-day management, and personnel transfers were rare; four officers were engaged in overseeing the subsidiaries; and Container's subsidiaries had some Container directors and officers on their boards of directors who did not generally play an active role in management decisions. Under those facts the Container enterprise was determined to be unitary, and the instant case presents an even clearer case of unitary operation.

Every Texas-Albertson's director and officer was an Albertson's employee or officer. Every decision made by Texas-Albertson's was actually made by Albertson's employees. In addition Albertson's employees performed other activities including keeping books, tax return preparation, payment of officers and directors, and preparation of corporate meeting documents. The parent in *Container* held or guaranteed half of the subsidiaries' long term debt, and Albertson's furnished all of Texas-Albertson's initial operating capital with no written agreements providing for repayment of capital or interest to Albertson's.

Each criterion suggested by the Supreme Court in *Container* before a unitary business can be found is met by the close operational relationship which existed between Albertson's and Texas-Albertson's.

■ Accordingly, the trial court erred in its conclusion that "Albertson's, Inc. and Texas-Albertson's should not be considered unitary." Although the opinion of the trial court reflects that it understood and utilized the principles set forth above for ascertaining the existence of a unitary business operation, *it reached an inappropriate result by virtue of its attempt to apply those principles as between Albertson's and the Skaggs-Albertson's partnership instead of between Albertson's, Inc.*

*and Texas-Albertson's.* Internal Revenue Code, 26 U.S.C. § 701 provides:

**§ 701. Partners, not partnership, subject to tax**

A partnership as such shall not be subject to the income tax imposed by this chapter. Persons carrying on business as partners shall be liable for income tax only in their separate or individual capacities.

The tax treatment of partnerships is explained in Bittker & Eustice, *Federal Income Taxation of Corporations and Shareholders*, Section 1.07, p. 1–26 (4th Ed. 1979).

Partnerships are not taxed as such (§ 701), but each partner is taxed on his share of the firm's income, whether it is distributed to him or not. Under the prevailing conduit theory, the character of such items as ordinary income, capital gains and losses, charitable contributions, tax exempt interests, etc., carries over to the partner (§ 702).

Idaho Code § 63–3002 provides in part:

**Declaration of Intent.**—It is the intent of the legislature by the adoption of this act, insofar as possible to make the provisions of the Idaho act identical to the provisions of the Federal Internal Revenue Code relating to the measurement of taxable income, ... by the application of the various provisions of the Federal Internal Revenue Code relating to ... taxation of trusts, estates, partnerships and corporations....

The Tax Commission has never attempted to combine the Skaggs-Albertson's partnership with Albertson's, Inc. under the unitary principle. Only the wholly-owned subsidiary corporation was included in the Commission's combination. This is evidenced by the explanation of items contained in the Notice of Deficiency Determination and by the decision of the Tax Commission. The Tax Commission did not combine the partnership with Albertson's and include the partnership's income with Albertson's. The Tax Commission assigned

Texas-Albertson's distributive share (50%) of the Partnership's income, deductions, and apportionment factors to Texas-Albertson's and this share of the income belonging to Texas-Albertson's was combined with Albertson's income, and apportioned under the UDITPA formula in order to accurately reflect Albertson's income in Idaho. The result thus reached is exactly what Albertson's would have paid in Idaho taxes had the subsidiary never been formed.

The Tax Commission urges as an additional issue on appeal that the trial court further erred in refusing to allocate totally to Idaho (rather than apportion) the $746,890 paid directly from Texas-Albertson's to Albertson's as a return on investment in the fiscal year ending January 29, 1977. The Commission correctly argues that to be consistent, if the trial court ruled that there was not a "unitary business" then, by definition, the $746,890.00 becomes non-business income which must be allocated totally to Idaho. Our ruling on the primary issue in this case renders that assigned error moot.

The decision of the trial court is reversed and the case is remanded to the trial court for further proceedings consistent with this opinion.

Costs to the appellant, no attorney's fees awarded.

DONALDSON, C.J., and SHEPARD, BAKES and BISTLINE, JJ., concur.