## Commonwealth v. Frank G. Shattuck Co.

*Manuel Kraus* and *Morris H. Goldman,* for appellant.

*Frank A. Sinon,* Deputy Attorney General, and *Claude T. Reno,* Attorney General, for Commonwealth.

HARGEST, P. J., December 13, 1941.—This case arises upon an appeal by defendant from the refusal of the Board of Finance and Revenue to revise defendant's corporate net income tax settlement for the year 1936. The case was heard without the intervention of a jury.

## Statute involved

The tax imposed is under section 2 of the Corporate Net Income Tax Act of May 16, 1935, P. L. 208, as reenacted and amended by the Act of August 7, 1936, P. L. 127, which imposes an excise tax upon corporations.

Section 2 defines "Net Income":

"1. In case the entire business of the corporation is transacted within this Commonwealth, net income for the calendar year or fiscal year as returned to, and ascertained by the Federal Government, subject, however, to any correction thereof, for fraud, evasion, or error as finally ascertained by the Federal Government . . . .

"2. In case the entire business of any corporation is not transacted within this Commonwealth, the tax imposed by this act shall be based upon such portion of the net income of such corporation for the fiscal or calendar year, as defined in clause one hereof, as may be determined by allocations and apportionments made as follows: [Then follow certain provisions not applicable here.]

"(c) The remainder of such net income shall be divided into three equal parts.

"(1) Of one-third, such portion shall be attributed to business carried on within the Commonwealth, as shall be found by multiplying said one-third by a fraction, whose numerator is the value of the corporation's tangible property situated within this Commonwealth, and whose denominator is the value of all the corporation's tangible property wherever situated.

"(2) Of one-third, such portion shall be attributed to business carried on within the Commonwealth, as shall be found by multiplying said one-third by a fraction whose numerator is the expenditure of the corporation for wages, salaries, commissions, and other compensation to its employes, and assignable to this

Commonwealth as hereinafter provided, and whose denominator is the total expenditures of the corporation for wages, salaries, commissions, and other compensation, to all its employes.

"(3) Of the remaining third, such portion shall be attributed to business carried on within the Commonwealth, as shall be found by multiplying said third by a fraction, whose numerator is the amount of the taxpayer's gross receipts from business assignable to this Commonwealth as hereinafter provided, and whose denominator is the amount of the taxpayer's gross receipts from all its business."

## Facts

The facts have been found in answer to requests which have been filed of record, but we repeat certain of them which are necessary to the discussion in this opinion.

Defendant filed its corporate net income tax report for the year 1936, which showed total income of $522,201.31. Defendant was engaged in the operation of 45 restaurants in a number of cities in various States, one of which restaurants was conducted in the City of Philadelphia. It reported a net loss from the operation of the Philadelphia restaurant for the year 1936 of $10,408.26, which loss was arrived at by charging the sum of $4,857.57, at the rate of one half of one percent of sales, against the Philadelphia restaurant by the home office for its share of administrative and bookkeeping expenses, which was at the rate of one fourth of that charged against other restaurants owned by the company. Without such charge, the actual net loss of the Philadelphia restaurant would have been $5,550.69. By the application of the fraction to determine the tax under the statute, the percentage of income allocated to Pennsylvania was .018439, which, applied to the total income, amounted to total allocated income of $9,630.71, and the tax thereon, at the rate of 10 percent, was settled at $963.07.

The home office of defendant is located in the City of New York. Advertising of defendant is controlled at the home office for the benefit of the entire chain. The funds of defendant for all of the restaurants, with the exception of a petty cash fund, are maintained at the central office. The expenses are likewise paid from the central office maintained for the benefit of the whole chain. The dresses used by the waitresses are uniform and prescribed by the home office. Purchases of such commodities as could be properly purchased in bulk are made by the central office for the whole chain, and are charged to the Philadelphia restaurant at cost, although the manager of the Philadelphia restaurant was authorized to purchase such articles as vegetables and meats in Philadelphia. The menus were to some extent supervised by the home office, but the manager of the Philadelphia restaurant had some discretion with regard to them. The Philadelphia restaurant maintained its own kitchen and made its own ice cream, and employed and trained its own help. Separate accounting records are kept for each restaurant. The bulk of the candy sold by the Shattuck restaurants was manufactured by W. F. Schraft & Sons Corp., Boston, Mass., which is a subsidiary of the defendant company, and was required by the home office to be purchased from the latter concern, and is purchased at a price less than other independent stores can purchase the same candy from the Schraft Corporation. The Philadelphia operations of defendant are closely related to the operations of defendant without this Commonwealth. The entire record shows that defendant is engaged in the enterprise of maintaining restaurants and selling candy.

## Questions Involved

1. Is defendant engaged in a unitary enterprise so that its tax may be measured according to the statutory formula defined in the Corporate Net Income Tax Act

of May 16, 1935, P. L. 208, as amended by the Act of August 7, 1936, P. L. 127?

2. Is the Commonwealth limited to a tax on the net income actually earned in this Commonwealth, or may it employ the formula prescribed by the statute, measured by the income returned to, and ascertained by, the Federal Government, as distinguished from a tax upon the net income actually earned within this Commonwealth?

### Discussion

There is no dispute about the facts. Defendant reported a net loss from the operation of its Philadelphia restaurant for the year 1936 of $10,408.26, which was arrived at by charging against the Philadelphia restaurant $4,857.57 by the home office for its share of administrative and bookkeeping expenses, making an actual loss from the operation of the Philadelphia store of $5,550.69.

In approaching the discussion, we must keep in mind:

(a) Laws should be so interpreted and applied as to avoid, as far as possible, unjust and oppressive consequences; and tax laws must be construed strictly against the government and in favor of the taxpayer: Husband's Estate, 316 Pa. 361.

(b) Taxation is a practical and not a scientific problem: Commonwealth v. Dunkard Valley Oil & Gas Co., 41 Dauph. 164, 168; Commonwealth v. Eastern Securities Co., 309 Pa. 44, 48.

The act in question has been determined to be generally constitutional in the case of Turco Paint & Varnish Co. v. Kalodner et al., 320 Pa. 421, so that the present question before us is whether its application to defendant is unconstitutional.

1. The first question is whether defendant is engaged in a unitary business.

It operates 45 restaurants in various cities and States, one of which is in Philadelphia. The home of-

fice is in New York. The funds for all restaurants, with the exception of a petty cash fund, are maintained in New York. The advertising is controlled and the expenses are paid there for the benefit of the whole chain. Purchases are made in bulk for such commodities as can be properly purchased, and charged to the Philadelphia restaurant at cost. Menus are, to some extent, supervised, and the dresses of waitresses are uniform, and prescribed by the home office. The candy sold is manufactured by a subsidiary of defendant company and required to be purchased from the latter concern by the home office.

In Commonwealth v. Ford Motor Co., 45 D. & C. 492, we had occasion to examine the question of a unitary business. In that case the Ford Motor Company engaged in the manufacture and sale of automobiles, which involved: (1) The purchase and production of raw materials; (2) the manufacture of many products necessary for the completed product; (3) the assembling of those parts into finished automobiles; and (4) the sale and servicing of the finished automobiles. The company had two plants in Pennsylvania, one for assembling and sales, and one as a sales and service depot. It was contended that the business was not a unitary business and that the two branches of business done here were distinct and separate, so that the business could not be considered a unitary business. After careful consideration, we held that the company was engaged in a unitary business so as to subject it to tax under the Foreign Franchise Tax Act, the formula of which is similar to the act in question.

The business of the Ford Company was also found to be a unitary one in the case of Ford Motor Co. v. Clark et al. (entitled in the United States Supreme Court, Ford Motor Co. v. Beauchamp), 100 F. (2d) 515; Ford Motor Co. v. Beauchamp et al., 308 U. S. 331.

Appellant, indulging in rather nice distinctions, has tried to distinguish the Ford case from the instant case. We are not impressed by the distinctions. On the contrary, we think the business of defendant is more unitary than that of the Ford Company.

In the case of Butler Bros. v. McColgan, 111 P. (2d) 334 (Cal. 1941), the Supreme Court of California has discussed at length the principles which determine a unitary business. In that case Butler Bros. operated seven wholesale distributing houses in various cities, one of which was in San Francisco, each house serving a separate territory. At each house stocks of goods were maintained. Each house handled its own sales and kept books of account. Part of the operating expenses of the houses was incurred and paid at the respective houses, such as items of labor and rentals. The remainder, consisting of items of common expense, such as executive salaries, corporate overhead, and expenses of operating a central buying division and central advertising division, was incurred and paid at the home office. The expenses thereof were allocated to the respective houses. This situation was very similar to the instant case. For the year 1935 the amount of such allocation expense charged to the San Francisco house was $100,091, of which approximately 75 percent would have been incurred even though the San Francisco house was not operated. The company maintained a central buying division, and goods were shipped by manufacturers to the houses where the costs thereof and the transportation charges thereon were entered on the books of the house. No charges were made against any house for the benefit of the company, but the actual cost of operating the central buying division was allocated to the houses. By computing the income from the operation of the San Francisco house, deducting from the gross receipts from sales in California the cost of such merchandise, the direct expenses of the San Francisco house, and the proportionate share

of the common expense, the San Francisco house operated at a loss of $82,851 for the year 1935. In the year 1935 the operation of all houses produced a profit of $1,149,677.

The Franchise Tax Act of California applied an allocation system similar to the act of Pennsylvania now in question. A tax of $3,798.43 was assessed against the company, predicated on an allocation to California of 8.1372 percent of the total income of the company. In discussing the unitary question, the court said (p. 336):

"It is only if its business within this state is truly separate and distinct from its business without this state, so that the segregation of income may be made clearly and accurately, that the separate accounting method may properly be used. Where, however, interstate operations are carried on and that portion of the corporation's business done within the state cannot be clearly segregated from that done outside the state, the unit rule of assessment is employed as a device for allocating to the state for taxation its fair share of the taxable values to the taxpayer. . . . If there is any evidence to sustain a finding that the operations of appellant in California during the year 1935 contributed to the net income derived from its entire operations in the United States, then the entire business of appellant is so clearly unitary as to require a fair system of apportionment by the formula method in order to prevent overtaxation to the corporation or undertaxation by the state. . . .

". . . It is our opinion that the sales made in each of the seven states in which appellant does business must be proportionately credited with the profits resulting from the purchasing power which such sales in the aggregate produce. Other salient factors indicating the unitary character of appellant's business are the central advertising division and the central accounting and management division. The former en-

ables appellant to spread its advertising cost over more stores and units and to secure its advertising at a lower cost per unit, thereby making possible advertising opportunities unavailable to a single store; as to the latter (central accounting and management department), the volume of business resulting from operation of the company's several stores permits better as well as more costly services of accounting and management to be available to each store, whereas if each were separately operated, services of such quality in all probability would be too expensive to be practicable."

After reviewing at length a number of cases, the court said (p. 341):

"In accordance with the foregoing analysis it is our opinion that the unitary nature of appellant's business is definitely established by the presence of the following circumstances: (1) unity of ownership; (2) unity of operation as evidenced by central purchasing, advertising, accounting and management divisions; and (3) unity of use in its centralized executive force and general system of operation."

In Maxwell, etc., v. Kent-Coffey Mfg. Co., 204 N. C. 365, 168 S. E. 397, 399, affirmed in 291 U. S. 642, with reference to unitary business, the court said:

"That term is simply descriptive, and primarily means that the concern to which it is applied is carrying on one kind of business—a business, the component parts of which are too closely connected and necessary to each other to justify division or separate consideration, as independent units."

Again defendant here endeavors to distinguish the Maxwell case from the instant case, but we are not impressed with the distinction.

On the question of the unitary character of the business, we may refer without quotation to the cases of Underwood Typewriter Co. v. Chamberlain, 254 U. S. 113, 65 L. Ed. 165, Bass, Ratcliff & Gretton, Ltd., v. State Tax Commission, 266 U. S. 271, 69 L. Ed. 282,

North American Cement Corp. v. Graves et al., 269 N. Y. 507, 199 N. E. 510, 299 U. S. 517, 81 L. Ed. 381, and International Elevator Co. v. Thoresen, etc., 58 N. D. 776, 228 N. W. 192. An examination of the foregoing authorities requires us to find as a fact that defendant conducts a unitary business.

2. The second question is whether, since defendant is conducting a unitary business, the Commonwealth may employ the formula prescribed by the statute, or whether it is confined specifically to a tax on the income received in Pennsylvania from the unit therein located. Defendant contends that there can be no settlement for any tax which takes into account income derived outside of Pennsylvania and the tax must be limited to the receipts in Pennsylvania.

This case comes to a parting of the ways. Defendant has shown specifically the amount of income and loss from the Pennsylvania branch of its business. If there can be no tax under this statute levying an excise tax on the doing of business in Pennsylvania unless that branch of the business in Pennsylvania yields a net profit, defendant must prevail. If, however, the Pennsylvania unit must be considered as a part of the defendant's whole business which may reflect value to the whole business because of the privilege of doing business in Pennsylvania, then the Commonwealth should recover.

Defendant relies principally upon the cases of Hans Rees' Sons, Inc., v. North Carolina ex rel., 283 U. S. 123, Turco Paint & Varnish Co. v. Kalodner et al., supra, p. 430, Matson Navigation Co. et al. v. State Board of Equalization of California, 297 U. S. 441, and Norfolk & Western Railway Co. v. North Carolina ex rel., 297 U. S. 682.

Relying upon the Hans Rees' case, supra, defendant contends that, even though there be a unitary enterprise, the activities which are conducted in different jurisdictions cannot, for the purpose of taxation, be re-

garded as component parts of a single unit so as to tax net income by the application of a formula when, in fact, there is no net income.

The Hans Rees' case, unexplained by other decisions of the Supreme Court of the United States, seems to lead to such a conclusion. In that case a statutory method was used which included consideration of the real estate and tangible property both from within and without the State and the total net income as a basis for taxation. The statute imposed upon foreign corporations an income tax equivalent to 4 percent on that proportion of its entire income which the fair cash value of its real estate and tangible property in the State bore to the fair cash value of its entire real estate and tangible property. The company was a New York corporation engaged in tanning, manufacturing, and selling belting and other heavy leathers. It had a manufacturing plant at Asheville, North Carolina. The business was conducted both on wholesale and retail plans. The tannery at Asheville was used as a manufacturing plant and supply house. Some sales were made in North Carolina. The sales office was located in New York, and sales were made throughout this country, Canada, and Europe. The assessments in question allocated to North Carolina, pursuant to the statutory method, approximately 85 percent of appellant's income. The State of North Carolina relied upon the cases of Bass, Ratcliff & Gretton, Ltd., v. State Tax Commission, supra, and Underwood Typewriter Co. v. Chamberlain, supra, but at page 132 the Supreme Court of the United States distinguished those cases because:

"Evidence which was found to be lacking in the *Underwood* and *Bass* cases is present here. These decisions are not authority for the conclusion that where a corporation manufactures in one State and sells in another, the net profits of the entire transaction, as a unitary enterprise, may be attributed, regardless of evidence, to either State. . . .

"The difficulty of making an exact apportionment is apparent and hence, when the State has adopted a method not intrinsically arbitrary, it will be sustained until proof is offered of an unreasonable and arbitrary application in particular cases. But the fact that the corporate enterprise is a unitary one, in the sense that the ultimate gain is derived from the entire business, does not mean that for the purpose of taxation the activities which are conducted in different jurisdictions are to be regarded as 'component parts of a single unit' so that the entire net income may be taxed in one State regardless of the extent to which it may be derived from the conduct of the enterprise in another State. . . . When, as in this case, there are different taxing jurisdictions, each competent to lay a tax with respect to what lies within, and is done within, its own borders, and the question is necessarily one of apportionment, evidence may always be received which tends to show that a State has applied a method, which, albeit fair on its face, operates so as to reach profits which are in no just sense attributable to transactions within its jurisdiction." (Italics supplied.)

We point out, however, that "the entire income" in the instant case is not attempted to be taxed.

The formula under the statute in question makes: (a) The tangible property in the State the numerator and all the corporation's tangible property the denominator; (b) the wages, salaries, and commissions in this State the numerator, the total wages, salaries, and commissions the denominator; and (c) the gross receipts in this State the numerator and the total gross receipts the denominator. In each case one third of the net income is the multiplicand. Does such a formula, under the language of the Hans Rees' case above quoted, "reach profits which are in no just sense attributable to transactions" within this State? We think not. If the Hans Rees' case be pressed to the limit for which defendant contends, then any corporation

which may have tremendous operations within the State, under the protection of our laws, if there happened to be no net income from those operations, would not have to pay one cent of the excise tax under this statute. We are of opinion that the Hans Rees' case should not be pressed to sustain such a situation.

The Hans Rees' case has subsequently been quoted with approval. In Matson Navigation Co. et al. v. State Board of Equalization, supra, the case arose under the California Bank and Franchise Tax Act, which provides that every business corporation "shall annually pay to the state, for the privilege of exercising its corporate franchise within this state, a tax according to or measured by its net income, to be computed at the rate of four per cent. upon that income for the preceding year," under the provisions which the statute prescribes. The Matson Company and the Oceanic Steamship Company, California corporations, did an intrastate, interstate, and foreign business. They made a consolidated return showing $730,357.81 from the intrastate business and $2,526,148.22 from the interstate and foreign business. They maintained that the tax should not be more than four percent of their net income from intrastate business. The tax commissioner held that there should be included in the computation the part of their net income from interstate and foreign commerce, which he found to be 22.2 percent. This tax was sustained. In referring to the Hans Rees' case, the court said (p. 444) :

"We there held that a method of allocating, for taxation, to a State that part of the income of a foreign corporation which bears the same ratio to its entire net income as the value of its tangible property within that State bears to the value of all its tangible property works an unconstitutional result if the part of the income thus attributed to the State is out of all appropriate proportion to the business there transacted by the corporation."

We understand this language to mean that, regardless of where the income is earned, if only such part of it which the tangible property in the State bears to the "value of all its tangible property" is allocated to the State it is not an unconstitutional allocation. If then, in addition to the tangible property, the income is spread over a fraction that takes into consideration gross income and payrolls for allocation purposes, there would seem to be no constitutional inhibition.

In the case of Norfolk & Western Railway Co. v. North Carolina ex rel., 297 U. S. 682, the railway company was a Virginia corporation. The statute prescribed a formula for allocating operating revenues and operating expenses to the lines within and without the State, and by applying the average mileage prorate of the entire railway system. In that case it was held that (p. 685):

"A formula not arbitrary on its face or in its general operation may be unworkable or unfair when applied to a particular railway in particular conditions. . . . A segment of the line may operate under handicaps resulting from the nature of the traffic, the topography of the country, the maladjustment or inadequacy of passenger or freight tariffs in one district or another. As applied to such a segment the average mileage prorate of the entire railway system may be an arbitrary test of the relation between revenue and expenses. . . . If this is made to appear with an ensuing burden on the taxpayer grossly in excess of the results of a more accurate apportionment, the statute to that extent is an unconstitutional endeavor to tax the income of a business in another jurisdiction."

There is nothing in the instant case to show that there were any peculiar conditions in the operations of the Philadelphia business of the company or that they were any different from those in other cities. The only outstanding fact is that it had no net income.

As against the reasoning of defendant, based especially upon the Hans Rees' case, there is an abundance of authority from which the inference seems to be clearly drawn that an excise tax based upon net income may take into consideration the value of one unit to the whole business, to be apportioned to the entire net income for the purpose of taxation, even though the particular unit may have had no net income.

The case of Commonwealth v. Columbia Gas & Electric Corp., 336 Pa. 209, involved a claim under the Franchise Tax Act, in which precisely the same formula is used as that in the instant case for determining the taxable value of the capital stock in Pennsylvania. The court said (p. 221) :

"The Act provides for the ascertainment of taxable value by a measure. In its process it applies allocating fractions to each foreign corporation's entire capital stock value. These fractions, as stated above, concern corporate activity. While they bear some relation to capital stock value, intrinsically they determine the taxable value of the corporate activity within this State rather than of the property located here. That it is the value of the franchise rather than the actual value of the property which is taken into account is clear from the factors which enter into the apportionment. They are the same which this Court considered in *Turco Paint & Varnish Co. v. Kalodner*, 320 Pa. 421, where income was the fundamental base. It does not ascertain physical worth of assets located in this State, but arrives at a value which the functional or operating organic unit within this State possesses. It represents what the right to do business is worth. It must follow that the tax is not levied on property but on the franchise to do business measured by a taxable value secured through the application of the factors of gross receipts, tangibles and payrolls to the capital stock value. It is representative of the value of that very franchise."

Unless there is some fundamental distinction which prevents the application of the same principles to the ascertainment of an excise tax that are applied to the ascertainment of a franchise tax, then the Columbia Gas & Electric Corp. case, supra, is authority. The Supreme Court has made no such distinction in that case. The Legislature of Pennsylvania has drawn no such distinction. It uses precisely the same fraction, in which gross receipts, tangible property, and payrolls are used to measure the value of the franchise in one case and the income in the other. It may be said that a franchise tax is based upon the privilege of doing business and an excise tax is on the actual doing of business. Each of them is a tax upon privilege.

In the case of Great Atlantic & Pacific Tea Co. et al. v. Grosjean et al., 301 U. S. 412, the statute of Louisiana was sustained. It levied an occupation or license tax on chain stores within the State and took into account all stores in the chain. We are unable to see much distinction between this nature of a tax and an excise tax upon income, in which the receipts, tangibles, and payrolls in the State are proportioned to the total receipts, tangibles, and payrolls, and applied to the total income. This was a unitary business, although that matter was not controlling, and the Supreme Court said (p. 425) :

"In legal contemplation the state does not lay a tax upon property lying beyond her borders nor does she tax any privilege exercised and enjoyed by the taxpayer in other states. The law rates the privilege enjoyed in Louisiana according to the nature and extent of that privilege in the light of the advantages, the capacity, and the competitive ability of the chain's stores in Louisiana considered not by themselves, as if they constituted the whole organization, but in their setting as integral parts of a much larger organization. We cannot hold that this privilege is unaffected by the status of the Louisiana stores as members of such a

chain or that recognition of the advantages and capacities enjoyed by them as a result of that membership is forbidden in classifying them for progressive increase of rate. Such classification is not in legal effect the taxation of property or privileges possessed or enjoyed by the taxpayer beyond the borders of the state."

In Southern Realty Corp. et al. v. McCallum et al., 65 F.(2d) 934, in which a certiorari was denied, 290 U. S. 692, the Texas Corporate Franchise Law was involved, which based the tax upon the proportion of outstanding capital stock, surplus, and undivided profits, plus the amount of outstanding bonds, notes, and debentures, other than those maturing in less than a year, which the gross receipts from the business done in Texas bore to the total gross receipts of the corporation. The court said (p. 936) :

"That a state may impose such a franchise or business privilege tax, and may measure it by the capital stock and surplus used by the corporation in its business or by its income therefrom, although business is done in more states than one, without unconstitutional interference with interstate commerce or other federal prerogative and without a taxing of property beyond the jurisdiction of the taxing state, when the capital by which the tax is measured is reasonably apportioned according to the business there done, is settled by many decisions." (Citing cases.)

In Maxwell, etc., v. Kent-Coffey Mfg. Co., supra, the statute involved was the Income Tax Act of North Carolina, which provides for the apportionment of net income to the State by taking such proportion of the corporation's net income as the fair cash value of its real estate and tangible property within the State bore to the fair cash value of its entire real estate and tangible property. It was admitted that the business was a unitary business. The statute and its application to defendant company were sustained. The Su-

preme Court refused the certiorari on the ground that that case was controlled by Underwood Typewriter Co. v. Chamberlain, 254 U. S. 113, and not by the Hans Rees' case, supra.

In the Underwood Typewriter case, supra, the company was engaged in the manufacture of typewriters. The statute imposed a tax on net income by a statutory formula, "which attributes to processes conducted within the State the proportion of the total net income which the value of real and tangible personal property owned by the corporation within the State bears to the value of all its real and tangible personal property." The company objected on the ground that its income in Connecticut was $42,942.18, while its total net income was $1,293,643.95; yet, under the method of apportionment required by the statute, 47 percent of its net income was attributable to operations in Connecticut. The imposition of the tax was sustained, largely on the ground that the company was in a manufacturing business. It was therein said (p. 120) :

"The legislature in attempting to put upon this business its fair share of the burden of taxation was faced with the impossibility of allocating specifically the profits earned by the processes conducted within its borders. It, therefore, adopted a method of apportionment which, for all that appears in this record, reached, and was meant to reach, only the profits earned within the State."

In Bass, Ratcliff & Gretton, Ltd., v. State Tax Commission, 266 U. S. 271, the statute imposed a tax for the privilege of doing business based upon that part of the net income determined by the proportion which the aggregate value of the specified classes of the assets of the corporation within the State bore to the aggregate value of all such assets wherever located. The company is a British corporation engaged in brewing and selling Bass' ale. Its total income was

$2,185,600. The aggregate value of its property was $3,501,483. Applying the fraction required by the statute, the commission allotted to New York segregated assets amounting to $27,537.68, which the company contended was not based upon net income derived from the business it carried on in New York but upon the proportion of its net income carried on outside the United States and arbitrarily allocated to New York. The Supreme Court said, after referring to the Underwood Typewriter case (p. 282):

"So in the present case we are of opinion that, as the Company carried on the unitary business of manufacturing and selling ale, in which its profits were earned by a series of transactions beginning with the manufacture in England and ending in sales in New York and other places—the process of manufacturing resulting in no profits until it ends in sales—the State was justified in attributing to New York a just proportion of the profits earned by the Company from such unitary business."

In the case of Ford Motor Co. v. Clark et al., 100 F. (2d) 515, the Texas statute imposing a franchise tax on corporations was involved. The act based the tax on that proportion of capital stock, surplus and undivided profits, plus outstanding notes and bonds running for more than a year, which the gross receipts from business done in Texas the previous year bore to the gross receipts of the entire business. The statute was sustained against the attack of the company that it established an arbitrary basis. The Texas business was 3.858 percent of the whole. The court said (p. 517):

"When business is done also in other states, so that the business potency inherent in the capital is thus divided, it is not arbitrary to apportion the capital which is to measure the tax in proportion to the income realized in the taxing State. . . . If it [the corporation] chooses to sell in Texas, and extract cash from Texas,

with the great advantage that manufacturing its own wares gives in competition with those who do not manufacture, it is not unreasonable to regard the potency of the capital used in manufacture as following proportionately the goods offered for sale in Texas. . . . It is more reasonable to do as the Texas statute has done, to consider that in making sales and realizing income in Texas all the capital the seller has used in preparing the goods for sale has contributed to the result."

Ford Motor Co. v. Beauchamp et al., 308 U. S. 331, is the title which the last-cited case took in the Supreme Court of the United States, and it was there said (p. 336) :

"In a unitary enterprise, property outside the state, when correlated in use with property within the state, necessarily affects the worth of the privilege within the state. Financial power inherent in the possession of assets may be applied, with flexibility, at whatever point within or without the state the managers of the business may determine. . . . The weight, in determining the value of the intrastate privilege, given the property beyond the state boundaries is but a recognition of the very real effect its existence has upon the value of the privilege granted within the taxing state."

The Commonwealth relies strongly upon the case of Butler Bros. v. McColgan, supra, which defendant has attempted, by nicety of distinction, to differentiate from the instant case. We think that unless the difference lies in the fact that the instant case involves an income tax and the Butler case a franchise tax there is no difference in principle, and the Butler case is highly persuasive in favor of the Commonwealth. We have hereinbefore stated the facts of this case.

In that case, Butler Bros., a foreign corporation, operated seven wholesale distributing houses, one being in San Francisco which operated at a loss of $82,851 for the tax year. The operations of all the houses pro-

duced a profit of $1,149,677. The Butler Bros. paid a minimum tax of $25. The tax commission assessed an additional tax of $3,798.43, which was predicated on an allocation to California of 8.1372 percent of the total income of the company derived from all sources. Such percentage was determined by the mathematical average of the percentages which the value of the tangible property, payrolls and gross sales attributable to California bore to the corresponding items of all houses of the company.

It was noted that the same allocation is involved in the Pennsylvania statute. The court held that, the business being a unitary one, that part of it done within the State of California could not be clearly segregated from that done outside the State, and that the entire business of appellant was subject to the formula, so as to provide a fair tax upon the privilege of doing business in California, measured by the income of the entire business. The court said (p. 337):

"The weakness of appellant's argument is readily apparent when pursued to its logical conclusion. If the omission of the California sales would have no effect on the purchasing power, the omission of sales in an equal amount wherever made would likewise have no effect on the company's ability to purchase at a saving. Thus, by proceeding in turn from state to state, it could be shown that none of the sales in any of the states should be credited with the income resulting from the purchasing of goods in large quantities. . . .

". . . This central purchasing factor is completely analogous and comparable to the manufacturing activities in the Underwood Typewriter and Bass Ale cases, supra, wherein we find recognition of the principle that income from sales is attributable to the series of transactions from which the income is derived."

After reviewing at length the Underwood, Bass, and Hans Rees' cases, the court said (p. 339):

"Careful analysis of the underlying legal principles considered in the Hans Rees' case compels us to conclude that it, like the Underwood Typewriter and Bass Ale cases, supra, recognized that where a business is unitary in character, so that its separate parts cannot be fairly considered by themselves and the whole business in the several states derives a value from the unity of use, allocation of income upon a reasonable formula is properly sustained."

And after reviewing also at length the cases of North American Cement Corp. v. Graves, 269 N. Y. 507, 199 N. E. 510, 299 U. S. 517, Standard Oil Co., etc., v. Wisconsin Tax Comm., 197 Wis. 630, 223 N. W. 85, International Elevator Co. v. Thoreson, supra; Great Atlantic & Pacific Tea Co. et al. v. Grosjean et al., 301 U. S. 412, and Matson Navigation Co. et al. v. State Board of Equalization of California, 297 U. S. 441, the court said (p. 341) :

"The reasonable and equitable character of this state's formula, based on factors properly reflecting the relative contribution of the activities in the various states to the production of the total unitary income so as not to contravene the restrictions implicit in the fourteenth amendment against taxing property outside the state, was recognized in Matson Navigation Co. v. State Board of Equalization, supra. Accordingly, respondent correctly applied the formula method of apportionment to determine California's portion of appellant's income from the business carried on within and without the state."

In the case of Butler Bros., supra, the cases of North American Cement Corp. v. Graves et al., supra, and Standard Oil Co., etc., v. Wisconsin Tax Comm., supra, were reviewed. The cement company case was decided upon the authority of the Bass case, although the taxpayer showed that by separate accounting much less income would be allocated to the taxing State. It was affirmed by a memorandum per curiam both in the

Appellate Division of the New York Supreme Court, in the New York Court of Appeals, and in the Supreme Court of the United States. The taxpayer, a foreign corporation, owned and operated three cement plants and one lime plant and sold the products thereof. Two of the cement plants were in New York, one was in Maryland, and the lime plant in West Virginia. The four plants were operated separately and the products sold in separate districts. The corporation kept separate accounts for them. It sold very little of the output in West Virginia and Maryland plants in New York. The tax commission allocated the net income of the corporation by one formula, the property factor, for the years in question. By this means, large incomes were allocated to New York for each of those years. The corporation, by an elaborate separate accounting system, showed that for 1925 the New York income was much less than that allocated to the State by the formula and for the years 1926, 1927, and 1929 large losses were sustained from the New York business, instead of deriving from New York the income allocated to it by the formula. In the face of this evidence, the Supreme Court of the United States, affirming the New York appellate courts, sustained the tax under the formula. The court, in the Butler Bros. case, reviewing the New York case, said (p. 340) :

"The significance of this decision on two points involved in the instant case is readily apparent: (1) it holds that the operations of four separate manufacturing plants, one of them making a different product from different materials than the others, are so interrelated as properly to be treated as unitary; (2) it holds that separate accounting in accordance with recognized accounting practice is insufficient evidence to disprove the propriety and presumption of fairness of formula allocation. On both points this decision is contrary to Standard Oil Co. v. Wisconsin Tax Comm., 1929, 197 Wis. 630, 223 N. W. 85, on which appellant

strongly relies in asserting that the results of its separate accounting must be accepted by respondent as tax administrator. However, careful examination of the factual situation in this Wisconsin case reveals a peculiar distinguishing allocation factor which undoubtedly exerted a strong influence on the result reached by the court there."

It is difficult to square the North American Cement Co. case with the Hens Rees' case. In the Hans Rees' case the company prevailed because of a distinct separate accounting, which clearly showed the corporate activity and income attributable to the State, but, in the North American Cement Corp. case, there was a separate accounting to show the same thing, yet the tax was sustained.

In Commonwealth v. Ford Motor Co., 45 D. & C. 492, we said (p. 524):

"We have found that the Ford Motor Company can segregate with reasonable mathematical accuracy the proportion of its tangible property, wages and salaries, and gross receipts attributable to the business in Pennsylvania. This calculation, however, does not take into consideration the business in Pennsylvania as reflected in its 'setting as integral parts of a much larger organization,' as stated in Great Atlantic & Pacific Tea Co. et al. v. Grosjean et al., supra, and does not include anything which, in the language of the Supreme Court in the Columbia Gas case, has any 'degree of correlation as to situs with tangibles.' The latter case held (p. 220) that: 'It was undoubtedly within the power of the legislature to permit this correlation to be worked out through the use of a fraction which considered tangible assets only, leaving a more exact correspondence to be brought about through the interaction and effect of the other fractions composed of gross receipts and payrolls.' As we understand the effect of the latter case, we are forced to conclude that the method employed of using the whole tangible property and the total wages

and salaries and the total gross receipts as the denominator, and the whole capital stock as the multiplicand in the allocation fractions, is not unconstitutional."

After reviewing all of the authorities, we are of opinion that the formula prescribed by the Pennsylvania statute providing for an excise tax measured by income is not unconstitutional in its application to defendant company, even though the company can segregate with reasonable mathematical accuracy its activities within the State, and even though such segregation shows no net income but a loss from its activities within the State for the tax year.

We conclude that a foreign corporation doing an intrastate business under the protection of the Pennsylvania laws may not escape all taxation under this excise statute merely because in the year in question it had no net income. There is no flat tax upon the income. The income is used only as a base for measuring the excise tax by taking into account the tangible property, the payrolls, and gross receipts in the State in proportion to the total of such items of the corporation.

### Conclusions of law

1. The Frank G. Shattuck Company is engaged in a unitary business, and its restaurant in the City of Philadelphia is a unit of such business.

2. The tax imposed pursuant to the Corporate Net Income Tax Act of May 16, 1935, P. L. 208, as reenacted and amended by the Act of August 7, 1936, P. L. 127, is an excise tax and not a tax upon income as such.

3. The income returned to and ascertained by the Federal Government is the exclusive measure of the tax for the privilege of doing business.

4. It is constitutional to use the net income returned to and ascertained by the Federal Government as the measure of an excise tax for the privilege of doing business.

5. The formula used in the Act of 1935, as amended, is valid for the purpose of imposing an excise tax, and, by the use of such formula, no tax is imposed upon the income as such.

6. The act of assembly in its application to defendant company does not violate either the fourteenth amendment to the Constitution of the United States, or article IX, sec. 1, of the Constitution of Pennsylvania, in that it attempts to levy a tax based on income outside of the jurisdiction of Pennsylvania.

7. Judgment should be entered in favor of the Commonwealth.

*Statement*

| | |
|---|---|
| Tax Due | $963.07 |
| Interest, at the rate of 6%, from April 9, 1940, to Dec. 15, 1941 | 97.27 |
| | $1,060.34 |
| Attorney General's Commission 5% | 53.02 |
| Total Due | $1,113.36 |

*Judgment*

And now, December 15, 1941, judgment is hereby directed to be entered in favor of the Commonwealth, and against Frank G. Shattuck Company in the sum of $1,113.36, unless exceptions be filed within the time limited by law.