592 P.2d 39

**AMERICAN SMELTING AND REFINING COMPANY,**
Plaintiff-Respondent,

v.

**IDAHO STATE TAX COMMISSION,**
Defendant-Appellant.

No. 12198.

Supreme Court of Idaho.

March 12, 1979.

David H. Leroy, Atty. Gen., Theodore V. Spangler, Jr., Deputy Atty. Gen., Boise, for defendant-appellant.

William D. Dexter, Gen. Counsel, Olympia, Wash., for amicus curiae, Multistate Tax Commission.

Philip E. Peterson, Lewiston, R. Michael Southcombe, of Clemons, Cosho & Humphrey, Boise, George Beatty, of Lee, Toomey & Kent, Washington, D. C., for plaintiff-respondent.

Dale G. Higer, of Eberle, Berlin, Kading, Turnbow & Gillespie, Boise, for amicus curiae U. S. Steel Corp.

BAKES, Justice.

This appeal involves state income tax deficiencies assessed against the plaintiff respondent American Smelting and Refining Company (ASARCO) by the defendant appellant Idaho State Tax Commission (Commission). The principal issues concern the apportionment of ASARCO's income from tangible and intangible property as "business income" under the Idaho version of the Uniform Division of Income for Tax Purposes Act (UDITPA).

I

THE FACTUAL BACKGROUND

In 1965 Idaho adopted with slight modification the Uniform Division of Income for Tax Purposes Act (UDITPA). I.C. § 63–3027. The Act contains rules for determining the portion of a corporation's total income from a multistate business which is attributable to this state and therefore subject to Idaho's income tax. In general, UDITPA divides a multistate corporation's income into two groups: business income and non-business income. Business income is apportioned according to a three factor formula, I.C. § 63–3027(i), while non-business income is allocated to a specific jurisdiction. I.C. § 63–3027(d)–(h). Idaho modified UDITPA to provide that "a parent and subsidiary corporation may, when necessary to accurately reflect income, be considered a single corporation." I.C. § 63–3027(s).

ASARCO is a multistate-multinational corporation primarily engaged in mining, smelting and refining nonferrous metals. ASARCO owns stock in several domestic and foreign corporations, most of which are engaged in similar or related operations. ASARCO's commercial domicile is in New York. Its Idaho activities include the operation of two mines, the Page Lead Zinc Mine and the Galena Silver Mine, and the location of its northwest mining department headquarters in Wallace, Idaho. ASARCO also sells in Idaho small amounts of secondary metals—metals reclaimed from scrap metal.

In 1971 the Multistate Tax Commission (MTC) completed a joint audit of ASARCO on behalf of Idaho and five other states. The MTC is the administrative agency of the Multistate Tax Compact, of which Idaho is a member. I.C. § 63–3701. Article VIII of the compact authorizes the MTC to perform interstate audits on behalf of member states. Idaho statutes specifically authorize the Idaho State Tax Commission to participate in such joint audits. I.C. § 63–3707. The constitutionality of the Multistate Tax Compact, including its joint audit provisions, has been upheld. *United States Steel Corp. v. Multistate Tax Comm'n*, 434 U.S. 452, 98 S.Ct. 799, 54 L.Ed.2d 682 (1978); *Kinnear v. Hertz Corp.*, 86 Wash.2d 407, 545 P.2d 1186 (1976).

The MTC auditor made several significant adjustments in the computation of ASARCO's Idaho tax returns for the years of 1968, 1969 and 1970. These adjustments, which were accepted by the Idaho State Tax Commission, resulted in the tax defi-

ciencies at issue in this case. These adjustments may be summarized as follows.

The MTC auditor combined or "unitized" with ASARCO, pursuant to I.C. § 63–3027(s), six corporations—all wholly owned subsidiaries of ASARCO.[1] Because these corporations were unitized with ASARCO, their incomes were combined with ASARCO's for Idaho tax purposes. However, dividends paid by the six corporations to ASARCO were not considered as income to ASARCO but were viewed by the auditor as intracompany transfers.

The MTC auditor also made significant changes in the computation of ASARCO's "business income," which was subject to apportionment. I.C. § 63–3027(i). These changes are best summarized in terms of the type of income involved.

*Dividend Income*: From a monetary standpoint, this is the most significant of the disputed items of income. The MTC auditor included as business income dividends paid ASARCO by various corporations, other than the six "unitized" corporations. The dividends from these "non-unitized" corporations totaled $48,310,126.00 in 1968, $66,374,428.00 in 1969, and $61,772,970.00 in 1970. This dividend income represented a substantial portion of ASARCO's total income for the tax years in question. Summarized below are the activities of the principal corporations which paid ASARCO these dividends and their relationship to ASARCO.

1. Southern Peru Copper Corporation: This corporation produces blister copper, a material which is 99% copper and also contains byproduct material such as gold, silver and florium. ASARCO owns 51.5% of the stock and the remainder is owned by three other mining companies. Pursuant to a management agreement, ASARCO is entitled to elect a plurality but not a majority of the directors. Southern Peru has its own staff, but ASARCO provides certain technical assistance such as purchasing, traffic and tax preparation services. ASARCO receives a negotiated fee for these services.

Approximately 30% of Southern Peru's blister copper is sold to European customers through Southern Peru Copper Sales Corporation. The stock ownership in this sales corporation is the same as in Southern Peru. However, it is staffed entirely by ASARCO employees. The European sales are made through the sales corporation in order to preserve Southern Peru's favored federal tax status as a Western Hemisphere Trading Corporation. The remainder of Southern Peru's blister copper is divided among the four stockholders according to their ownership, *e. g.*, ASARCO receives 51.5% of the remainder. The price for the copper is determined by reference to a quotation in a trade publication, and during the years in question ASARCO's purchases from Southern Peru were substantial. This output contract with Southern Peru is important to ASARCO but is not essential to its smelting business.

2. M.I.M. Holdings, Ltd.: This is a major corporation engaged in the mining, milling, smelting and refining of copper, lead, zinc and silver in Australia and which also operates a lead and zinc refinery in England. Hence, it is involved in virtually the same business as ASARCO. ASARCO owns 52.7% of the stock, and the rest is widely held. However, ASARCO has no directors or officers in M.I.M. At trial an ASARCO executive explained its failure to elect any directors as follows:

> "This company has been very successful in staffing the corporation with Australian people and [they have] been able to run this company by themselves and, therefore, in consequence of the nationalistic feeling which develops in most of such developing countries we have not exercised any right we might have to elect a director to the board of the company."

M.I.M. uses an ASARCO furnace patent, for which it pays a royalty, and occasionally ASARCO provides it some technical serv-

---

1. The "unitized" corporations were: Federal Metals of Canada; ASARCO Mercantile Co.; Enthone, Inc.; International Metal Co.; Lone Star Lead Construction Co.; and Northern Peru Mining Co.

ices. It is not economically feasible to ship ore or concentrates from Australia to the United States for smelting and there is only an insignificant amount of sales between these two corporations. In general, M.I.M. operates independently of ASARCO.

3. General Cable and Revere Copper: These two copper fabricators are major customers of ASARCO and ASARCO owned approximately 34% of the stock in each corporation. The remaining stock was widely held. Revere Copper also uses an ASARCO patent, for which it pays royalties, and both companies utilize ASARCO's stock transfer department, for which they pay a fee. In 1961 the United States Department of Justice filed an antitrust action against ASARCO because of its interest in General Cable and Revere Copper. The action resulted in consent decrees signed in 1967 which prohibited ASARCO from maintaining common officers in these companies, voting its stock, selling these companies copper at prices lower than those quoted their competitors, and acquiring stock in any other copper fabricator. In 1970 ASARCO was compelled to divest itself of its stock in General Cable. Following the divestiture, General Cable continued to be a major customer of ASARCO.

4. Lake Asbestos of Quebec, Ltd.: This company mines and processes asbestos fibers in Canada. Its products are sold throughout the world, and in order to preserve its status as a Western Hemisphere Trading Corporation its sales are made through a conduit corporation, ASARCO International Corporation. Both Lake Asbestos and ASARCO Intl. are wholly owned by ASARCO. Lake Asbestos has its own staff, but ASARCO provides important management services. Lake Asbestos seeks ASARCO's direction and approval on major policy decisions. ASARCO Intl. is staffed entirely by ASARCO and Lake Asbestos employees. The business activities and operations of Lake Asbestos and ASARCO Intl. are in a field unrelated to ASARCO's mining and smelting operations and involve different technology. ASARCO shared no facilities, customers or sales force with these companies and it did not purchase any of their products.

5. ASARCO Mexicana, S.A.: This company mines and smelts lead and copper in Mexico. ASARCO owns 49% of the stock and the remainder is publicly held by Mexican nationals. At one time ASARCO owned 100% of the company, but in 1965 was required by Mexican law to divest itself of 51% of the stock. ASARCO Mexicana does not seek approval from ASARCO concerning major policy decisions, but ASARCO does provide technical services, makes some direct purchases from ASARCO Mexicana, and acts as its agent for sales outside Mexico. ASARCO Mexicana pays ASARCO for those services.

6. Compania American Smelting, S.A.: This is a small company which purchases ore in Chile for ASARCO smelters. It is wholly owned by ASARCO and paid ASARCO small dividends in 1968 and 1969.

7. Hecla Mining Co., Kennecott Copper Co., Phelps-Dodge and United Park City Mines: These are four mining companies in which ASARCO owns a very small percentage of the stock. ASARCO exercises no control over these corporations and they made only minimal sales to ASARCO.

*Interest Income:* ASARCO received interest income from a variety of sources, including customers' notes and bonds, notes taken in connection with the sale of an Illinois plant and the sale of General Cable stock, and time certificates, bankers' acceptances and commercial paper notes. In its brief ASARCO indicates that it originally reported only its interest income from trade accounts receivable as business income. The MTC auditor, however, classified all of the foregoing interest income as business income.

*Rents:* ASARCO's rental income, which the auditor considered business income, was for the most part derived from homesites rented to employees working near ASARCO mines and plants.

*Royalties:* ASARCO earned royalties from leases to third parties of a portion of its mineral land, and from licenses to third parties of patents developed by ASARCO

and used in ASARCO's business. The MTC auditor considered these royalties as business income.

*Capital gains and losses:* ASARCO realized gains on the disposition of three categories of assets: fixed assets, notes and bonds, and securities. The fixed assets were used in ASARCO's everyday business activities. The notes and bonds consisted of United States Treasury notes and bonds and state and municipal notes and bonds. They were primarily acquired with idle cash in order to earn a return while the funds were not needed in ASARCO's business operations and they were generally held less than a year. The securities were in ASARCO subsidiaries and General Cable. The gains and losses realized from the disposition of these assets were all considered as business income by the MTC auditor.

The MTC auditor also made an alteration in the computation of the three factor formula used to apportion ASARCO's business income. UDITPA provides for the computation of a ratio of the taxpayer's property, payroll and sales in Idaho to its property, payroll and sales everywhere. This ratio, the Idaho apportionment factor, is applied to the taxpayer's total business income and the result is the portion of the taxpayer's business income attributable to Idaho and subject to its income tax. I.C. § 63–3027(i)–(q). In computing the denominator—the everywhere portion—of the sales factor, ASARCO included the value of some ore transferred from its mines in Idaho to its smelter in Montana. However, ASARCO did not include those transfers in the numerator of the sales factor in either Idaho or Montana, which is also a member of the multistate compact and participated in the joint audit. The MTC auditor included those transfers in the numerator of the Idaho sales factor but not in the numerator of the Montana sales factor.

As a result of all the adjustments by the MTC auditor, which were adopted by the commission, the commission assessed against ASARCO Idaho income tax deficiencies of $92,471.88 for 1968, $111,292.44 for 1969, and $121,750.76 for 1970, plus interest. ASARCO sought review of the deficiencies in the district court pursuant to I.C. § 63–3049. Following a court trial, the district court upheld the combination of ASARCO with six of its subsidiaries for tax reporting purposes, but the court determined that the commission had erred in including the dividends, interest, royalties, rents and capital gains as business income. The district court did not modify the numerator of the sales factor to include the intracompany ore transfers as requested by the commission. The commission has appealed from the district court's ruling concerning the classification of income and from the court's refusal to modify the sales factor. ASARCO has not cross appealed from the district court ruling that the six subsidiaries were properly combined with ASARCO. This appeal therefore raises two sets of issues: (1) the classification of the disputed income, and (2) the modification in the sales factor. We address them in that order.

## II

### CLASSIFICATION OF INCOME

ASARCO challenged the commission's apportionment of its income from dividends, interest, rentals, capital gains and royalties as being inconsistent with a proper interpretation of the definition of business income found in I.C. § 63–3027(a)(1) and as being in violation of the due process and commerce clauses of the United States Constitution. We consider first the issue of statutory construction and second the constitutional issues.

### A

Interpretation of Statutory Provisions

Business income is defined as:

"63–3027. COMPUTING TAXABLE INCOME OF NONRESIDENT PERSONS AND ANY CORPORATIONS.—

.  .  .

"(a) As used in this section, unless the context otherwise requires:

"(1) 'Business income' means income arising from transactions and activity in the regular course of the taxpayers' trade or business and includes income from the acquisition, management, or disposition of tangible and intangible property when such acquisition, management, or disposition constitute integral *or necessary* parts of the taxpayers' trade or business operations. *Gains or losses and dividend and interest income from stock and securities of any foreign or domestic corporation shall be presumed to be income from intangible property, the acquisition, management, or disposition of which constitute an integral part of the taxpayers' trade or business; such presumption may only be overcome by clear and convincing evidence to the contrary.* . . . ." (Emphasis indicates provisions not part of the uniform act but added by the Idaho legislature.) [2]

A few general comments concerning this definition of business income are necessary in order to put the issues raised in this appeal in the proper perspective.

■ First, the income referred to in subsection (a)(1) is income arising from the taxpayer's trade or business which is conducted, in part at least, in this state. Some corporations, particularly large conglomerates, may be engaged in several separate and distinct trades or businesses. The state may include as business income only the taxpayer's income arising from a trade or business conducted in this state and is not entitled to apportion income arising from a trade or business having no connection with this state. However, "whether a number of business operations having common ownership constitute a single or unitary business or several separate businesses for tax purposes depends upon whether they are of mutual benefit to one another and on whether each operation is dependent on or contributory to others." *Great Lakes Pipe Line Co. v. Commissioner of Taxation,* 272 Minn. 403, 408, 138 N.W.2d 612, 616 (1965), *appeal dismissed* 384 U.S. 718, 86 S.Ct. 1886, 16 L.Ed.2d 881 (1966). *See Sperry & Hutchinson Co. v. Department of Revenue,* 270 Or. 329, 527 P.2d 729 (1974); Idaho State Tax Comm. Reg. 27.IV.1.(b).[3] This qualification, though not directly stated by the statute's literal language, is required by the theory underlying apportionment statutes, *i. e.,* that the business income of a unitary business operating in several states cannot be precisely identified with particular states, *see generally, Butler Bros. v. McColgan,* 315 U.S. 501, 62 S.Ct. 701, 86 L.Ed. 991 (1942); Keesling & Warren, The Unitary Concept in the Allocation of Income, 12 Hastings L.J. 42 (1960), and by the constitutional requirement that there must be some minimal connection between the interstate business activities generating the income and the state seeking to tax that income. *See Moorman Mfg. Co. v. Bair,* 437 U.S. 267, 98 S.Ct. 2340, 57 L.Ed.2d 197 (1978); *Champion International Corp. v. Bureau of Revenue,* 88 N.M. 411, 540 P.2d 1300, 1307–08 (Ct.App.1975) (Lopez, J., specially concurring).

■ Second, under I.C. § 63–3027(a)(1) business income includes not only a corporation's typical earnings from its business activities but also income from tangible and intangible property if that property and income has the requisite connection with the corporation's trade or business. Prior to UDITPA most states did not apportion a multistate corporation's income from dividends, interest, royalties, rents and gains, but, with some exceptions, the states allo-

**2.** In 1969 the legislature amended I.C. § 63–3027(a)(1) by deleting a phrase which limited the application of the presumption stated in the second sentence of the subsection to corporations "in which the taxpayer owns or has a right to acquire, directly or indirectly, more than five per cent (5%) of the voting stock . . . ." Ch. 319, § 9, 1969 Idaho Sess.Laws 982, 991–92. Neither party has argued that the prior statute requires a different result in this case than the application of the current statute, and the effect of that amendatory legislation is not an issue in this case.

**3.** Subsequent to the years involved in this appeal, the Idaho State Tax Commission adopted the interpretive regulations promulgated in 1973 by the Multistate Tax Commission. The Idaho regulation cited corresponds to MTC regulation IV.1.(b).

cated that income to a single jurisdiction. *See* State Taxation of Interstate Commerce: Hearings Before the Subcomm. on State Taxation of Interstate Commerce of the Senate Comm. on Finance, 93rd Cong. 1st Sess. 246, 252–54 (1973) (prepared statement of James H. Peters, The Distinction Between Business Income and Non-Business Income). Indeed, a preliminary draft of the uniform act followed this general approach. *See* First Tent. Draft of Uniform Allocation and Apportionment of Income Act, §§ 4–9, *reprinted in* Brief for Amicus Curiae, United States Steel Corp., Exhibit A. However, the Act in its final form and as enacted in this state specifically includes income from "the acquisition, management, or disposition of tangible and intangible property when such acquisition, management, or disposition constitute integral or necessary parts of the taxpayers' trade or business operations" as business income. I.C. § 63–3027(a)(1). This break with prior practice is underscored by the Idaho version of the Act which contains the specific presumption that income "from stock and securities of any foreign or domestic corporation" is business income and which may be overcome only by "clear and convincing evidence." I.C. § 63–3027(a)(1). In short, classifying income as interest, rents, royalties, dividends and capital gains does not determine whether the income is apportionable under UDITPA. All forms of income are subject to apportionment under UDITPA if the income falls within the definition of business income.

■ Third, we do not understand the statutory requirement that the acquisition, management, or disposition of the underlying property be an "integral or necessary" part of the taxpayer's trade or business, I.C. § 63–3027(a)(1), to mean that the property must be an absolutely indispensable part of the taxpayer's business. In taxation statutes the word "necessary" is not generally given such a restrictive meaning. *See, e. g.,* *Welch v. Helvering,* 290 U.S. 111, 54 S.Ct. 8, 78 L.Ed. 212 (1933) (expense deduction); *Palo Alto Town & Country Village, Inc. v. Commissioner of Internal Revenue,* 565 F.2d 1388 (9th Cir. 1977) (expense deduc-

tion); *Boy's Club of Clifton, Inc. v. Township of Jefferson,* 72 N.J. 389, 371 A.2d 22 (1977) (exemption from property tax). Also, the word "necessary" was added to the uniform act by the Idaho legislature at the same time it added the presumption that income from stock and securities is business income. *See* ch. 254, § 1, 1965 Idaho Sess. Laws 639, 642–47. A very restrictive interpretation of "integral or necessary" would be inconsistent with the apparent legislative belief that income from securities would generally be business income. In our view the phrase "integral or necessary parts of the taxpayers' trade or business operations" refers to property which, though not absolutely essential to the conduct of the taxpayer's business, contributes to and is identifiable with the taxpayer's trade or business operations. *Cf.* *Superior Oil Co. v. Franchise Tax Board,* 60 Cal.2d 406, 34 Cal.Rptr. 545, 550, 386 P.2d 33, 38 (1963) (defining "essential" as used in test for unitary business).

Although we do not read the phrase "integral or necessary" restrictively, our interpretation of that phrase is not as broad as that argued by the commission in this case. In a sense all investments and investment income of a corporation may benefit a corporation's business operations in that the investments may supply additional revenue for operating the trade or business, may improve the corporation's standing and financial posture, and in general may permit the corporation to conduct its regular business activities in a way it could not absent those investments. In this broad sense all corporate investments could be thought of as property the acquisition, management or disposition of which constitutes an integral or necessary part of its trade or business operations. This is the position argued by the commission. However, such an approach would include virtually all income as business income and would in effect emasculate the provisions of UDITPA which provide for the allocation of income from specified tangible and intangible property. *See* I.C. § 63–3027(d)–(h). Under such a test it is doubtful whether a corporation could re-

ceive income that would not be classified as business income. Although the legislature clearly intended that the income from tangible and intangible property be included as business income in proper circumstances, it likewise intended that there would continue to be such a thing as corporate non-business investment income. Just as we reject the notion that income from tangible or intangible property is to be automatically classified as non-business income, we reject the notion that such income is to be automatically considered business income simply because the taxpayer's business operations may receive some incidental benefits from those investments.[4] *But see Montana Department of Revenue v. American Smelting & Refining Co.,* 567 P.2d 901, 907–08 (Mont. 1977), *appeal dismissed* 434 U.S. 1042, 98 S.Ct. 884, 54 L.Ed.2d 793 (1978).

■ In our view, in order for such income to be properly classified as business income there must be a more direct relationship between the underlying asset and the taxpayer's trade or business. The incidental benefits from investments in general, such as enhanced credit standing and additional revenue, are not, in and of themselves, sufficient to bring the investment within the class of property the acquisition, management or disposition of which constitutes an integral part of the taxpayer's business operations. This view furthers the statutory policy of distinguishing that income which is truly derived from passive investments from income incidental to and connected with the taxpayer's business operations.

■ Finally, the facts in this case are based substantially on a lengthy stipulation between the parties, and for the most part they are not disputed. The decisive issues concern the proper application of the Idaho version of UDITPA to these facts. Accordingly, the scope of our review, which is a review of questions of law, is substantially broader than in cases where we are reviewing issues which turn on the resolution of disputed facts. *Montana Department of Revenue v. American Smelting & Refining Co., supra.* See *Wessells v. State,* 562 P.2d 1042 (Alaska 1977); *Walt Keeler Co. v. Atchison, Topeka & Santa Fe Ry. Co.,* 187 Kan. 125, 354 P.2d 368 (1960); *Wendling v. Cundall,* 568 P.2d 888 (Wyo.1977); *cf. Clements v. Clements,* 91 Idaho 732, 430 P.2d 98 (1967) (absence of findings disregarded where facts clear from record). Also, most of the disputed items of income are "[g]ains or losses and dividend and interest income from stock and securities of . . . foreign or domestic corporation[s]." I.C. § 63–3027(a)(1). Such items of income are presumed to be "from intangible property, the acquisition, management, or disposition of which constitute an integral part of the taxpayers' trade or business;" and this presumption may be overcome only by "clear and convincing evidence to the contrary." *Id.* Thus we must review the evidence to determine whether the trial court's findings contrary to that presumption are supported by clear and convincing evidence. *See Ed Sparks & Sons v. Joe Campbell Constr. Co.,* 99 Idaho 139, 578 P.2d 681 (1978).

With these principles in mind we turn now to the issues concerning the application of the business income definition to the items of income involved in this appeal. We discuss these issues in terms of the type of income involved.

*Dividends :* With respect to the dividends involved here, the critical question is whether this income arose from ASARCO's business activities and whether ASARCO's acquisition, management or disposition of the underlying stock constitutes an integral or necessary part of its mining, smelting and refining business.

4. The extent to which income from intangibles is to be apportioned as business income has been a source of controversy within the MTC itself. In 1971 the MTC promulgated interpretive regulations containing a very expansive definition of business income in this respect. *See* 32 CCH State Tax Rev. No. 40 at 3–4 (Oct. 5, 1971). However, in 1973 the MTC promulgated a new set of regulations which retreated somewhat from the expansive interpretation contained in the 1971 version. *See* 34 CCH State Tax Rev. No. 10 at 2–6 (Mar. 6, 1973); *see discussion* Boren, Specific Allocation of Corporate Income in California: Some Problems in the Uniform Division of Income for Tax Purposes, 30 Tax L.Rev. 607, 681–700 (1975).

■ The district court ruled that the commission erred in classifying the dividends as business income, stating:

"The next question is whether the dividends, interest, patent royalties and capital gains, together with rental income, were subject to tax by the State of Idaho as business income. The court has reviewed the facts and the authorities submitted by the parties and has concluded that they are not. American Smelting and Refining Company is in the business substantially of mining, smelting and refining and sales. The income described does not come from property or activities which is an integral part of taxpayer's trade or business. Plaintiff's position is well taken in that it would be unreasonable, unfair and contrary to the law to allow the State of Idaho to throw this income in to be taxed under the circumstances of this case without allowing the plaintiff to consider all of the income and all of the expenses of all of the corporations involved. It appears to the court that if the dividend income from other corporations is an integral part of the business of the plaintiff that they should be unitized and all matters considered and if they are not that the income is not business income but is non business income."

The district court appears to have disapproved of the commission's action in including the dividends as business income for two reasons. First, the district court stated that it was an error to include this income "without allowing [ASARCO] to consider all the income and all the expenses of all the corporations involved." Presumably the trial court was referring to the fact that the sales, payroll and property of the dividend-paying corporations were not represented in the three factor apportionment formula. We note, however, that although the statute clearly provides for the apportionment of dividend income when such income falls within the statutory definition of business income, it does not specifically provide for the representation of the sales, payroll and property of the dividend-paying corporations in the apportionment formula.

See I.C. § 63–3027(j)–(r). The commission's apportionment of the dividends without including the factors of these corporations in the formula did not violate the statutory provisions. However, the commission's action does raise certain constitutional questions which we consider later in this opinion.

■ Second, the district court seems to have concluded that since the corporations which paid the dividends were not sufficiently connected with ASARCO's business operations to justify combining those corporations with ASARCO for tax reporting purposes pursuant to I.C. § 63–3027(s), the stock ASARCO owned in those corporations was *ipso facto* not an integral or necessary part of ASARCO's trade or business so as to justify including the dividends they paid ASARCO as part of ASARCO's apportionable business income under I.C. § 63–3027(a)(1). When corporations are combined under subsection (s) for tax reporting purposes, the dividends paid one corporation by the other are not considered income but, as the commission did in this case, are properly treated as intracompany transfers. The district court's reasoning, therefore, would preclude dividends from ever being classified as business income and is thus clearly inconsistent with subsection (a)(1) which presumes that dividends are business income. The effect of this reasoning would nullify the statutory provision, a result we must avoid if possible. *Magnuson v. Idaho State Tax Commission*, 97 Idaho 917, 556 P.2d 1197 (1976).

■ However, these provisions are not necessarily inconsistent. They have different objectives and they can be read harmoniously if those objectives are kept in mind. The combined reporting provision of subsection (s) is a further refinement of the basic apportionment principle. Its purpose is to permit application of the UDITPA formula to a single business enterprise which is conducted by means of separately incorporated entities. *See United States Steel Corp. v. Multistate Tax Commission*, 434 U.S. 452, 473, n. 25, 98 S.Ct. 799, 813, n. 25, 54 L.Ed.2d 682 (1978). In an economic sense

such a business is no different than a similar business composed of a single corporation with several separate divisions. *Compare Butler Bros. v. McColgan, supra, with Edison California Stores, Inc. v. McColgan,* 30 Cal.2d 472, 183 P.2d 16 (1947). For tax reporting purposes such businesses should be treated the same. *Coca Cola Co. v. Department of Revenue,* 271 Or. 517, 533 P.2d 788 (1975); Keesling, A Current Look at the Combined Report and Uniform Allocation Practices, 42 J.Tax. 106 (1975).

In contrast, subsection (a)(1), which authorizes the apportionment of a taxpayer's dividend income in certain circumstances, addresses a very different question. While the combined reporting provision concerns a proper identification of the contours of the business enterprise, the business income definition of subsection (a)(1) concerns the differentiation between truly passive investment income and income which is incidental to or connected with the taxpayer's business operations. These are two related but conceptually and legally very different questions. Simply because the management, operation and activity of a corporation in which the taxpayer owns stock is not so closely connected with the management, operation and activities of the taxpayer to warrant a combined tax return, does not *ipso facto* mean that the dividends the taxpayer receives from that stock cannot be "income arising from transactions and activity in the regular course of the taxpayers' trade or business" and that the "acquisition, management, or disposition" of the stock does not "constitute integral or necessary parts of the taxpayers' trade or business operations." I.C. § 63–3027(a)(1). The combined reporting provision and the business income definition serve different purposes, ask different questions and apply different standards. The answer to one does not necessarily imply the same answer to the other.

With respect to the dividends ASARCO received from Southern Peru Copper Corp.; M.I.M. Holdings, Ltd.; General Cable; Revere Copper; ASARCO Mexicana, S.A.; and Compania American Smelting, S.A., we conclude that the record does not contain clear and convincing evidence to rebut the statutory presumption and does not support the trial court's finding that those dividends were not business income. For the years in question ASARCO owned a controlling or at least a very substantial interest in each of these corporations. They are all engaged in businesses closely related to ASARCO's mining and smelting operations and, with the exception of M.I.M., ASARCO did a substantial amount of business with them and provided them with a variety of technical services. The clear inference from these facts is that ASARCO's interest in these companies was not merely that of a passive investor but that this dividend income arises from ASARCO's mining and smelting business and that ASARCO acquired and maintained its ownership interest in these companies as an integral and necessary part of its mining and smelting business. We recognize that M.I.M., for the years in question, seems to have operated independently of ASARCO and did little if any business with ASARCO. Although ASARCO owns a controlling interest in M.I.M., ASARCO did not exercise its right to control the corporation, apparently for political reasons. Nevertheless, ASARCO does own a majority of M.I.M. stock and M.I.M. is engaged in virtually the same business as ASARCO. Given these facts and the statutory presumption we conclude that the trial court erred in concluding that ASARCO's interest in M.I.M. was merely a passive investment unrelated to ASARCO's mining and smelting business.

However, we conclude that there was clear and convincing evidence to sustain the trial court's finding that the dividends from Lake Asbestos, ASARCO Int., Hecla Mining Co., Kennecott Copper Co., Phelps-Dodge and United Park City Mines were not business income. Although the record indicates certain management connections between ASARCO and Lake Asbestos and ASARCO Intl., the record indicates that this asbestos mining and processing activity is distinct, separate and unrelated to ASARCO's general mining and smelting business. Regardless of whether the dividends these cor-

porations paid ASARCO would have constituted business income with respect to an asbestos business, the record discloses that these asbestos operations have no connection with the trade or business ASARCO conducts. Therefore, that dividend income is not business income subject to apportionment by this state. *See Sperry & Hutchinson Co. v. Department of Revenue, supra.*

■ The four remaining companies from which ASARCO received dividends are all engaged in mining activities similar to those pursued by ASARCO. Nevertheless, ASARCO's stock ownership in those companies is so small and its business dealings with them are so insignificant that, despite the statutory presumption, we conclude that the trial court's finding that AS-ARCO's ownership of that stock was more of a separate investment activity than a part of its trade or business operations is supported by the evidence. Therefore, the dividends these companies paid ASARCO should not have been included as business income.

■ *Interest*:[5] In general, the source of ASARCO's interest income was customer notes and other obligations AS-ARCO received in the regular course of its mining and smelting operations. As such, they were therefore properly considered as business income by the commission, and the trial court's findings to the contrary are not supported by the evidence. *See Montana Department of Revenue v. American Smelting & Refining Co., supra; Sperry & Hutchinson Co. v. Department of Revenue, supra; Champion International Corp. v. Bureau of Revenue, supra; cf. Great Lakes Pipe Line Co. v. Commissioner of Taxation,* 272 Minn. 403, 138 N.W.2d 612 (1965) (interpreting statute analogous to UDITPA), *appeal dismissed* 384 U.S. 718, 86 S.Ct. 1886, 16 L.Ed.2d 881 (1966).

*Rents*: ASARCO's rental income was primarily derived from property used in or very closely related to its mining and smelting operations. Accordingly, the trial court erred in excluding rents from business income. I.C. § 63–3027(a)(1) and (d). *See Montana Department of Revenue v. American Smelting & Refining Co., supra; Champion International Corp. v. Bureau of Revenue, supra.*

■ *Royalties*: The record indicates that the assets generating ASARCO's royalty income were acquired or developed by ASARCO in the course of its regular business operations. This income was related to or a consequence of its business operations and was therefore properly considered business income by the commission. *See Montana Department of Revenue v. American Smelting & Refining Co., supra; cf. Texaco, Inc. v. Wasson,* 237 S.E.2d 75 (S.C.1977) (interpreting statute analogous to UDITPA).

*Capital gains and losses*: As previously mentioned, ASARCO's capital gains and losses resulted from the disposition of three types of assets: fixed assets, short term notes and bonds, and securities.

■ The fixed assets were used in AS-ARCO's everyday business activities and therefore gains realized on their disposition were business income. The trial court's finding to the contrary is not supported by the evidence.

■ The notes and bonds represented the short term investment of idle funds until they were needed in ASARCO's ordinary business operations. Accordingly, the trial court erred in not considering the gains realized from the disposition of those notes and bonds as business income. *See Montana Department of Revenue v. American Smelting & Refining Co., supra; Sperry & Hutchinson Co. v. Department of Revenue, supra; Champion International Corp.*

---

5. The presumption of business income in I.C. § 63–3027(a)(1) extends only to "gains [and] losses and dividend and interest income from stock [or] securities of any foreign or domestic corporation . . . ." It does not apply to gains and losses and interest income from other sources or to rents and royalties. With respect to income not encompassed by the statutory presumption, ASARCO, as the plaintiff, bore the usual burden of persuading by a preponderance of the evidence.

*v. Bureau of Revenue, supra; cf. Great Lakes Pipe Line Co. v. Commissioner of Taxation, supra.*

■ ASARCO also realized gains from the sale of stock in its subsidiaries and General Cable. In our view the same standard applies to the question whether gains from the sale of stock are business income as applies to the question whether dividends from the stock are business income. The focus of the inquiry should be upon the purpose and use of the stock by ASARCO prior to its disposition. *See* I.C. § 63–3027(a)(1); *Montana Department of Revenue v. American Smelting & Refining Co., supra; Champion International Corp. v. Bureau of Revenue, supra; cf. Johns-Mansville Products Corp. v. Commissioner of Revenue Administration,* 115 N.H. 428, 343 A.2d 221 (1975) (similar approach, but not interpreting UDITPA), *appeal dismissed* 423 U.S. 1069, 96 S.Ct. 851, 47 L.Ed.2d 79 (1976). Inasmuch as we have already concluded that the trial court's conclusion that ASARCO sustained its burden of proving by clear and convincing evidence that the dividends it received from this stock were not business income is not supported by the evidence, we similarly conclude that the trial court's conclusion that the gains and losses realized on the disposition of the stock were not business income is not supported by the record.

Having resolved these issues concerning the items of ASARCO's income which are properly apportionable under the Idaho version of UDITPA, we consider now the constitutional questions.

### B

### Constitutional Issues

The constitutionality of formulary apportionment is firmly established under both the due process and commerce clauses of the United States Constitution. *Moorman Mfg. Co. v. Bair,* 437 U.S. 267, 98 S.Ct. 2340, 57 L.Ed.2d 197 (1978); *General Motors Corp. v. District of Columbia,* 380 U.S. 553, 85 S.Ct. 1156, 14 L.Ed.2d 68 (1965); *Bass, Ratcliff & Gratton, Ltd. v. State Tax Comm.,* 266 U.S. 271, 45 S.Ct. 82, 69 L.Ed. 282 (1924). ASARCO does not attack the constitutionality of formulary apportionment in the abstract, but argues that the manner in which the commission applied the UDITPA formula in this case produced a result violative of the due process and commerce clauses. We consider first the issues raised under the due process clause and then those raised under the commerce clause.

■ The Supreme Court of the United States recently summarized the limitations imposed by the due process clause on the states' power to tax the income of interstate businesses:

"The Due Process Clause places two restrictions on a State's power to tax income generated by the activities of an interstate business. First, no tax may be imposed, unless there is some minimal connection between those activities and the taxing State. . . . Second, the income attributed to the State for tax purposes must be rationally related to 'values connected with the taxing state.'" *Moorman Mfg. Co. v. Bair,* 437 U.S. 267, 273, 98 S.Ct. 2340, 2344, 57 L.Ed.2d 197 (1978) (citations omitted).

■ In the context of the first due process restriction, ASARCO argues that the commission imposed a tax on income derived from sources and activities which have no connection with this state. In particular, ASARCO refers to the apportionment of dividends it received. ASARCO argues that these dividends are derived from the business activities of the dividend-paying corporations and that these corporations have no connection with Idaho. This argument, however, rests upon a misconception of what the state sought to tax. As the Vermont court recently ruled in *In re Goodyear Tire & Rubber Co.,* 133 Vt. 132, 335 A.2d 310 (1975):

"Goodyear's constitutional argument rests on its allegations that its extra-territorial values are being taxed. This allegation, however, fails to distinguish the foreign dividend income that Goodyear receives from its subsidiaries from the

profits those subsidiaries realize from their own business activities conducted without the borders of Vermont. The right to receive dividends is incident to the ownership of stock. *LaFountain & Woolson Co. v. Brown*, 91 Vt. 340, 342, 101 A. 36 (1917). Profits, on the other hand, are the net proceeds obtained by deducting from the gross proceeds all forms of expense or outlay involved in, or incidental to, the business in question. *Stratton v. Cartmell*, 114 Vt. 191, 195, 42 A.2d 419 (1945).

. . . . .

"The failure of the county court to make a finding on the issue of whether Goodyear's subsidiaries were operated as separate entities does not constitute error because of the lack of relevance such a finding has to the taxation of foreign dividend income. Vermont's corporate income tax does not seek to tax the profits realized from the business activities of Goodyear's subsidiaries conducted without the borders of Vermont. It is taxing only the dividend income realized by Goodyear itself." *Id.* 335 A.2d at 311–12. *F. W. Woolworth Co. v. Commissioner of Taxes*, 133 Vt. 93, 328 A.2d 402 (1974); *Gulf Oil Corp. v. Morrison*, 120 Vt. 324, 141 A.2d 671 (1958). The commission did not levy a tax upon the income of the dividend-paying corporations; rather, it levied a tax upon ASARCO's income. Those dividends are clearly part of ASARCO's income and it is unquestioned that there is a sufficient connection between ASARCO and this state to constitutionally permit the state to tax its proper share of ASARCO's income. If the due process clause were to prohibit the inclusion of dividends in a taxpayer's taxable income unless the payor corporation also conducts business within the taxing state, the due process clause would logically also prohibit the taxpayer's domicile from taxing those dividends if the payor corporation did not conduct its business within the domiciliary state, and indeed it would prohibit the United States and any state from ever taxing dividends paid the taxpayer by a corporation whose activities are located en-

tirely without this country. The due process clause simply does not limit the right to tax dividends paid a taxpayer to the jurisdictions in which the payor corporation conducts its business. We believe that any constitutional limitations upon a state's right to apportion the intangible income, including dividends, of a multistate corporation doing business within the state are satisfied by the Idaho statutory requirement that the acquisition, management or disposition of the underlying asset must be an integral or necessary part of the taxpayer's unitary business, a part of which is conducted in this state. *See In re Goodyear Tire & Rubber Co., supra; F. W. Woolworth Co. v. Director of Division of Taxation*, 45 N.J. 466, 213 A.2d 1 (1965); *Great Lakes Pipe Line Co. v. Commissioner of Taxation*, 272 Minn. 403, 138 N.W.2d 612 (1965), *appeal dismissed* 384 U.S. 718, 86 S.Ct. 1886, 16 L.Ed.2d 881 (1966); *Champion International Corp. v. Bureau of Revenue*, 88 N.M. 411, 540 P.2d 1300 (App.Ct.1975); *cf. National Leather Co. v. Massachusetts*, 277 U.S. 413, 48 S.Ct. 534, 72 L.Ed. 935 (1928) (franchise tax measured by capital stock); *Cleveland-Cliffs Iron Co. v. Michigan Corporation & Securities Comm.*, 351 Mich. 652, 88 N.W.2d 564 (1958) (franchise tax measured by capital stock). *But see Square D Co. v. Kentucky Bd. of Tax Appeals*, 415 S.W.2d 594 (Ky.1967); *Gulf Oil Corp. v. Clayton*, 267 N.C. 15, 147 S.E.2d 522 (1966).

■ In the context of the second due process limitation—that the income attributed to Idaho for tax purposes must be rationally related to values connected with this state—ASARCO attacks the commission's computation of its tax liability on two grounds. ASARCO first argues that if the dividends it received are included as apportionable business income, then the due process clause requires that the property, payroll and sales factors of the dividend paying corporations be included in the denominator of the apportionment formula; otherwise ASARCO claims the income apportioned to Idaho would be disproportionate to the income producing activities within the state. This argument is premised on the same misconception about the entity and income

the state is attempting to tax that we discussed above and has been soundly rejected for the same reasons. *F. W. Woolworth Co. v. Commissioner of Taxes,* 133 Vt. 93, 328 A.2d 402 (1974); *see also F. W. Woolworth Co. v. Director of Division of Taxation,* 45 N.J. 466, 213 A.2d 1 (1965).

In any event, I.C. § 63–3027 does not provide for the inclusion of the factors of these corporations in the apportionment formula. From a constitutional standpoint, this argument presents the same question raised by ASARCO's second argument that, regardless of whether the apportionment formula was properly computed, in this case it produced a result violative of the due process clause. The United States Supreme Court recently summarized the burden AS-ARCO must sustain in order to prevail on this argument:

"... But in neither *Hans Rees'* (*Hans Rees' Son v. North Carolina,* 283 U.S. 123, 51 S.Ct. 385, 75 L.Ed. 879) nor *Norfolk & Western* (*Norfolk & Western R. Co. v. Missouri,* 390 U.S. 317, 88 S.Ct. 995, 19 L.Ed.2d 1201) did the Court depart from the basic principles that the States have wide latitude in the selection of apportionment formulas and that a formula-produced assessment will only be disturbed when the taxpayer has proved by 'clear and cogent evidence' that the income attributed to the State is in fact 'out of all appropriate proportion to the business transacted ... in that State.' 283 U.S., at 135, 51 S.Ct. at 389, or has 'led to a grossly distorted result.' 390 U.S., at 326, 88 S.Ct. at 1002. *Moorman Mfg. Co. v. Bair,* 437 U.S. 267, 274, 98 S.Ct. 2340, 2345, 57 L.Ed.2d 197 (1978).

ASARCO's arguments in this respect are based upon a comparison of the income apportioned to Idaho by the formula with the income ASARCO claims was actually earned by its Idaho operations as evidenced by its own separate accounting analysis. For example, ASARCO's separate accounting analysis shows a loss of $1,464,885 from its Idaho operations in 1969. This loss was primarily from its exploration and development activities. Testimony indicated that some of its Idaho operations operated at a

profit. However, the apportionment formula attributed $2,274,750, or 2.53% of AS-ARCO's business income in 1969, to Idaho.

In general, multistate businesses have been remarkably unsuccessful in attacking the results of apportionment formulas by comparing those results with those of a separate accounting analysis. *See, e. g., Butler Bros. v. McColgan,* 315 U.S. 501, 62 S.Ct. 701, 86 L.Ed. 991 (1942); *John Deere Plow Co. v. Franchise Tax Bd.,* 38 Cal. App.2d 214, 238 P.2d 569, *appeal dismissed* 343 U.S. 939, 72 S.Ct. 1036, 96 L.Ed. 1345 (1951); *Walgreen Co. v. Commissioner of Taxation,* 258 Minn. 522, 104 N.W.2d 714 (1960); *Crane Co. v. Carson,* 191 Tenn. 353, 234 S.W.2d 644, *cert. denied* 340 U.S. 906, 71 S.Ct. 282, 95 L.Ed. 655 (1950). *But see Hans Rees' Sons, Inc. v. North Carolina,* 283 U.S. 123, 51 S.Ct. 385, 75 L.Ed. 879 (1931) (formula which taxed 80% of income while only 17% had actual source in state). The reason why such arguments generally fail is explained in the United States Supreme Court's decision in *Butler Bros.:*

"It is true that appellant's separate accounting system for its San Francisco branch attributed no net income to California. But we need not impeach the integrity of that accounting system to say that it does not prove appellant's assertion that extraterritorial values are being taxed. Accounting practices for income statements may vary considerably according to the problem at hand. ... A particular accounting system, though useful or necessary as a business aid, may not fit the different requirements when a State seeks to tax values created by business within its borders. ... That may be due to the fact, as stated by Mr. Justice Brandeis in *Underwood Typewriter Co. v. Chamberlain,* 254 U.S. 113, 121, 41 S.Ct. 45, 47, 65 L.Ed. 165, that a State in attempting to place upon a business extending into several States 'its fair share of the burden of taxation' is 'faced with the impossibility of allocating specifically the profits earned by the processes conducted within its borders.' Furthermore, the particular system used may not

reveal the facts basic to the State's determination. . . . In either aspect of the matter the results of the accounting system employed by appellant do not impeach the validity or propriety of the formula which California has applied here." 315 U.S. at 507–08, 62 S.Ct. at 704 (citations omitted).

Accordingly, the constitutional question is not whether the result reached by the apportionment formula is grossly disproportionate to the result reached by ASARCO's separate accounting analysis, but the proper question is whether ASARCO has established by clear and cogent evidence that the income attributed to the state by the apportionment formula is in fact "out of all appropriate proportion" to ASARCO's business activities in the state. In our view ASARCO has not sustained that burden.

■ The essence of ASARCO's argument under the commerce clause is that since Idaho's use of the UDITPA apportionment formula may result in the duplicative taxation of its income by other states, the statute places an unconstitutional burden on interstate businesses. In particular, ASARCO emphasizes that since many states allocate income from intangible and tangible property to a single jurisdiction, the apportionment by Idaho of the same income will result in multiple taxation. However, ASARCO has not established that it was in fact subject to multiple taxation and the possibility of such double taxation has been rejected as a ground for invalidating an apportionment statute. *Moorman Mfg. Co. v. Bair, supra.* Moreover, the courts have consistently held that the possibility of overlapping taxation does not present constitutional problems so long as the state's formula, considered on its own merits, is not repugnant to the Constitution. *See Moorman Mfg. Co. v. Bair, supra; General Motors Corp. v. State*, 181 Colo. 360, 509 P.2d 1260 (1973); Hellerstein, Symposium Foreword, State Taxation Under the Commerce Clause: An Historical Perspective, 29 Vand.L.Rev. 335, 347 (1976). As the Court in *Moorman* stated:

"This method [formula apportionment], unlike separate accounting, does not pur-

port to identify the precise geographical source of a corporation's profits; rather, it is employed as a rough approximation of a corporation's income that is reasonably related to the activities conducted within the taxing State. The single-factor formula used by Iowa, therefore, generally will not produce a figure that represents the actual profits earned within the State. But the same is true of the Illinois three-factor formula. Both will occasionally over-reflect or under-reflect income attributable to the taxing State. Yet despite this imprecision, the Court has refused to impose strict constitutional restraints on a State's selection of a particular formula. 437 U.S. at 273, 98 S.Ct. at 2344.

We find no constitutional infirmity under the commerce clause in the statute before us in this case. The problem raised by ASARCO is essentially the result of the lack of uniformity between the states. It would indeed be ironic for us to strike down this statute, which is patterned after a widely adopted uniform act drafted in an attempt to provide some uniformity in this area, on the grounds · that it may be in conflict with the statutes of some other states which have not adopted the uniform act.

III

SALES FACTOR

■ In computing the sales factor for the tax years in question the commission included in the numerator, which represents the sales attributable to Idaho, intracompany transfers of ore from ASARCO's mines in Idaho to its smelter in Montana. The trial court excluded those transfers from the Idaho sales factor. ASARCO contends that the transfer should not be included in the numerator of the Idaho sales factor since the statute requires the sales to be reported on a destination basis and Idaho was not the final destination of these sales. I.C. § 63–3027(p)(1). The commission, however, argues that ASARCO's accounting method made it extremely difficult, if not

impossible, to determine the sales on a final destination basis and that its adjustment of the sales factor was a proper exercise of its authority under I.C. § 63–3027(r) to make adjustments in the formula when "the allocation and apportionment provisions of this section do not fairly represent the extent of the taxpayer's business activity in this state . . . .″

Although the record is somewhat confusing in this respect, the controversy appears to center on ASARCO's "margin method" of accounting, which ascribes the receipts from the sale of primary metals to the various steps within its mining, smelting and refining operations. According to the auditor's testimony at trial, if ASARCO, for example, received $6.00 on the final sale of a primary metal, its margin method of accounting would attribute, for example, $3.00 to its mining operation, $1.50 to its smelting operation, $1.00 to its refining operation, and the balance of $.50 to sales or sales commission.

The auditor appears to have encountered two problems in computing the sales factor with records maintained on this basis. First, I.C. § 63–3027(a)(5) and (o) require that the sales factor be computed on a gross receipts basis. The auditor testified that the total sales computed under this margin method of accounting would be the same as when computed on a gross receipts basis only if the ore was first extracted from ASARCO's mines. Where the ore was purchased from other mines, the auditor concluded that ASARCO's accounting method would reflect only the total value of the services ASARCO performed in smelting, refining and selling the ore, which in our example would be $3.00, and not the total gross receipts ASARCO would receive on the final sale of the product, $6.00 in our example.

Second, in general UDITPA requires that sales be reported in the numerator only if the goods were shipped to a purchaser in the taxing state. See I.C. §§ 63–3027(p)(1) and –3027(p)(2). Although this margin method of accounting would presumably indicate the value of the services performed by ASARCO's various operations in the various states, the auditor concluded that the records ASARCO maintained using this accounting method did not allow him to ascertain the final destination of ASARCO's sales of primary metals.

Because of these difficulties in using ASARCO's accounting method, the MTC auditor adjusted the numerator of the Idaho sales factor to include the value of ore shipped from ASARCO's mines in Idaho to its smelter in Montana. However, these transfers of ore were clearly not true sales but merely intracompany transfers. Nevertheless, the auditor apparently believed this adjustment was necessary because of his inability to compute the sales factor according to the statutory method and in order to make the computation of the numerator consistent with ASARCO's margin method of accounting and its computation of the denominator.

The trial court did not address the propriety of this adjustment. However, we believe that the apportionment formula should be computed according to the procedures set forth in the statute unless use of these procedures in a particular case is impossible or entirely impractical or unless it is clearly established that the result produced by the statutory formula does "not fairly represent the extent of the taxpayer's business activity in this state . . . ." I.C. § 63–3027(r). We therefore remand this issue to the district court for further proceedings to determine whether the sales factor can be computed according to the statutory method. If on remand the court concludes that it cannot or that it produces a result which manifestly does not represent the extent of ASARCO's activity in the state, the court is to determine whether the adjustment made by the commission was a reasonable exercise of its authority under I.C. § 63–3027(r).

The case is reversed and remanded for further proceedings and for recomputation of ASARCO's income tax liability in accordance with this opinion.

Reversed and remanded.

SHEPARD, C. J., and McFADDEN, DONALDSON and BISTLINE, JJ., concur.